**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**STEVE BOUTIN,**

**Plaintiff,**

**v.**

**HOME DEPOT U.S.A., INC.,**

**Defendant.**

**Civil Action No. 05-30162 MAP**

**DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH NO GENUINE ISSUE REMAINS TO BE TRIED**

In accordance with Rule 56.1 of the Local Rules of Civil Procedure and Rule 56 of the Federal Rules of Civil Procedure, defendant Home Depot U.S.A., Inc. hereby makes the following statement of material facts as to which no genuine issue remains to be tried:[1]

Overview of Parties

1. Plaintiff, Steven Boutin ("Plaintiff"), resides at 18 Dallaire Avenue, Chicopee, Massachusetts 01020. (Deposition of Steven Boutin ("Boutin Dep."), attached hereto as Exhibit 1, at 7).

2. Defendant, Home Depot U.S.A., Inc. ("Defendant" or "Home Depot"), has a place of business at 179 Dagget Drive, West Springfield, Massachusetts 01089. (Affidavit of Christopher O. Catalina ("Catalina Aff.") attached hereto as Exhibit 2 at ¶ ).

[1] These facts are deemed undisputed for the purposes of Defendant's Motion for Summary Judgment only.

Procedural History

3.    On July 16, 2003, Plaintiff filed a Charge with the Massachusetts Commission

Against Discrimination ("MCAD").  (Charge attached hereto as Exhibit 3).

4.    On May 13, 2004, the MCAD issued a Dismissal and Notification of Rights

indicating that it was "unable to conclude that the information establishes a

violation of the statutes."  (Dismissal and Notification of Rights attached hereto as

Exhibit 4).

5.    On or about July 7, 2005, Plaintiff filed the Complaint in the United States

District Court for the District of Massachusetts.  (Complaint attached hereto as

Exhibit 5).

6.    On or about October 20, 2005, Plaintiff filed the Amended Complaint in the

United States District Court for the District of Massachusetts.  (Amended

Complaint attached hereto as Exhibit 6).

Plaintiff's Employment History at Home Depot

7.    Plaintiff began his employment with Home Depot in its West Springfield store on

or about April 1, 1999.  (Boutin Dep., Ex. 1, at 10).

8.    During the relevant time period, Summer 2003, Plaintiff worked as a Phone

Center Associate.  (Boutin Dep., Ex. 1, at 18-19).  In March 2005, Plaintiff left

that position to become a Kitchen & Bath designer, which is still his position

today.  (Boutin Dep., Ex. 1, at 18, 21-22).

Plaintiff's Schedule
and Home Depot's Policy on Full-Time Employees' Schedules

9. For nearly the entirety of his fifteen-year tenure at Home Depot, Plaintiff has enjoyed a fixed schedule of 8:30 a.m. to 5:30 p.m., Monday through Friday. (Boutin Dep., Ex. 1, at 10-21; 48; 11).

10. In or around 2002, Home Depot instituted a policy requiring all full-time employees to work a flexible (rather than a fixed) schedule. (Catalina Aff., Ex. 2, at ¶ ). Plaintiff was aware of this policy. (Boutin Dep., Ex. 1, at 50-53).

11. Plaintiff provided Home Depot with a doctor's note dated May 13, 2002. (Boutin Dep., Ex. 1, at 50-54; May 13, 2002 note from Doctor Whitman whose medical records are attached hereto collectively as Exhibit 7). The note provided by Plaintiff indicated, in relevant part, that Plaintiff was "trying to raise his 9 year old daughter" and his doctor felt that changing Plaintiff's schedule "would be very detrimental to his mental status, and could cause a setback in his treatment." (Ex. 7). This was the first doctor's note Plaintiff ever provided to Defendant. (Boutin Dep., Ex. 1, at 52-53).

12. Defendant allowed Plaintiff to retain his fixed schedule at that time. (Boutin Dep., Ex.1, at 54-55).

Plaintiff's Child Care Responsibilities

13. Plaintiff has a daughter and a son, born in 1992 and 1990 respectively. (Boutin Dep., Ex. 1, at 26).

14. The biological mother of Plaintiff's daughter is his ex-wife, Darlene Buoniconti ("Ms. Buoniconti"). (Boutin Dep., Ex. 1, at 26-27). In late 1993, Plaintiff and

Ms. Buoniconti separated and Plaintiff had physical custody of their daughter. (Boutin Dep., Ex. 1, at 27-28).[2]

15. Sometime after 1992 but prior to 2003, Plaintiff and Ms. Buoniconti agreed to the following arrangement regarding time spent with their daughter: Ms. Buoniconti picks up her daughter at the bus stop after school on Mondays, Wednesdays, and Fridays and keeps her for the weekend every other weekend. (Boutin Dep., Ex. 1, at 28-33). This schedule was in place during the relevant time of Summer 2003 and remained in place as of the date of Plaintiff's deposition on May 17, 2006. (Boutin Dep., Ex. 1, at 30, 33). During the entire time Plaintiff and Ms. Buoniconti have shared custody in this manner, Ms. Buoniconti's work schedule has been a night shift that starts at 11:00 p.m. (Boutin Dep., Ex. 1, at 29, 33).

16. On Tuesdays and Thursdays (when Ms. Buoniconti did not pick up their daughter at the bus stop), Plaintiff's daughter was cared for by one of two neighbor/friends for a short period of time. (Boutin Dep., Ex. 1, at 43-47). They watched her from when she got out of school (2:30 p.m.) until 6:00 p.m. when Plaintiff would pick her up after work at their house. (Boutin Dep., Ex. 1, at 43-47).

17. Plaintiff's son's mother is Linda McKenzie ("Ms. McKenzie"). (Boutin Dep., Ex. 1, at 27). During Summer 2003, Plaintiff's son was living with his mother and Plaintiff saw him twice a week and every other weekend. (Boutin Dep., Ex. 1, at 36-37). On the weekdays when Plaintiff saw his son, Ms. McKenzie typically would drop off their son at Plaintiff's home at approximately 6:00 p.m. and Plaintiff would return him to Ms. McKenzie's home at 8:00 p.m. (Boutin Dep.,

[2] Plaintiff and Ms. Buoniconti were divorced in 1996. (Boutin Dep., Ex. 1, at 27).

Ex. 1, at 38). On the weekends when Plaintiff had his son, Plaintiff would pick him up on Friday at approximately 6:15 p.m. and return him to Ms. McKenize's home at 6:00 p.m. on Sunday. (Boutin Dep., Ex. 1, at 38-39).

18. There were opportunities each week when Plaintiff could have worked past 5:30 p.m. or on the weekend (on the days and weekends his children were with their mothers). (Boutin Dep., Ex. 1, at 47-48). Plaintiff insisted on his fixed schedule, however, because "it seemed easier to have the schedule the same all of the time." (Boutin Dep., Ex. 1, at 33-34). Since the days when Plaintiff had his children changed often, he "found it harder to ask for changes at Home Depot [than] to keep a set schedule" and "[i]t just made more sense to have one set schedule [than] to keep asking for changes all of the time." (Boutin Dep., Ex. 1, at 34-35).

Plaintiff's Summer 2003 Request For A New Fixed Schedule

19. In Summer 2003, Plaintiff requested his already fixed schedule be changed from 8:30 a.m. to 5:30 p.m., Monday through Friday, to 7:30 a.m. to 4:30 p.m., Monday through Friday. (Boutin Dep., Ex. 1, at 56-57, 71).

20. Plaintiff requested the change in schedule because his daughter's school hours were going to change in Fall 2003. (Boutin Dep., Ex. 1, at 56-57). Specifically, the bus was going to pick her up earlier, which meant Plaintiff now was available to be at work at 7:30 a.m. (Boutin Dep., Ex. 1, at 56-57).

21. Also during the Summer, Plaintiff provided Home Depot with his second doctor's note dated June 25, 2003. (June 25, 2003 letter from Dr. Whitman attached at Ex. 7). By that letter, Dr. Whitman indicated she felt "changing his schedule would impair his ability to cope", apparently addressing Plaintiff's concern that his

schedule may be modified in a way that would not meet his childcare needs. (Ex. 7). There are no other documents in Dr. Whitman's medical records that reflect any concern about Plaintiff's work schedule in or around Summer 2003. (Ex. 7). Plaintiff was treated by Dr. Whitman until she transferred him to Dr. White in or around May 2004. (Ex. 7).

22. Defendant reached out to Plaintiff by letter dated December 23, 2003 to obtain more information regarding his alleged medical condition to ascertain whether additional accommodations were required or appropriate. (Boutin Dep., Ex. 1, at 70-73; December 23, 2003 letter attached hereto as Exhibit 8). Plaintiff admittedly never made additional requests for a schedule change after Summer 2003. (Boutin Dep., Ex. 1, at 79).

23. Plaintiff provided a doctor's note in March 2004, but Plaintiff could not recall if that was in response to Defendant's December 2003 inquiry. (Boutin Dep., Ex. 1, at 72-73; March 26, 2004 note from Dr. White whose medical records are attached hereto collectively as Exhibit 9). That letter provided, in part, that Plaintiff is a "single parent and responsible for his 10 year old daughter," that "stressors" should be reduced, and that one "stressor is when there is a conflict between his work hours and the hours he needs to care for his daughter." (Ex. 9).

24. Plaintiff was allowed to retain his 8:30 a.m. to 5:30 p.m. fixed schedule but Defendant did not approve the change to the 7:30 a.m. to 4:30 p.m. fixed schedule. (Boutin Dep., Ex. 1, at 78-79; Catalina Aff., Ex. 2, at ¶3).

25. Allowing Plaintiff to start work at 7:30 a.m. and leave at 4:30 p.m. would have imposed a significant problem regarding coverage at the Phone Center, where

Plaintiff worked at the time. (Catalina Aff., Ex. 2, at ¶ 4). The Phone Center requires coverage until 6:00 p.m. (Catalina Aff., Ex. 2, at ¶ 4). Plaintiff's 5:30 p.m. departure, which he enjoyed for many years and still enjoys, already left a half-hour void. (Catalina Aff., Ex. 2, at ¶ 4). As a result, the managers are regularly forced to take an employee from a different position and place him or her at the Phone Desk for that half-hour. (Catalina Aff., Ex. 2, at ¶ 4). Not only does this disturb staffing levels, but it also results in the phones not being covered at all times, which is essential. (Catalina Aff., Ex. 2, at ¶ 4). Obviously, if Plaintiff were to start leaving work at 4:30 p.m., that would only exacerbate the problem. (Catalina Aff., Ex. 2, at ¶ 4). Moreover, the shifting of staffing unfairly burdens the other employees forced to cover the Phone Desk in Plaintiff's absence. (Catalina Aff., Ex. 2, at ¶ 4).

26. Plaintiff admits the only impact of not getting this change in schedule was that he had some free time that he considered "a waste of time" between when he dropped his daughter off at the bus and when he had to arrive for work. (Boutin Dep., Ex. 1, at 79-80). Plaintiff also testified that not being allowed to leave work at 4:30 p.m. resulted in his daughter having to stay with the women who watched her after school for an extra half hour since she got out of school earlier that year. (Boutin Dep., Ex. 1, at 80-81).

Other Employees With Monday Through Friday Schedules

27. Since 2002, only part-time employees are allowed to work a "fixed" schedule, like Plaintiff's. (Catalina Aff., Ex. 2, at ¶ 5). No full-time employees at the West Springfield Home Depot have absolutely fixed schedules. (Catalina Aff., Ex. 2, at

¶ 5).  Although certain positions are more amenable to regular schedules, those employees still are required to maintain flexibility to work outside of those schedules, including on weekends, should there be a business need for that. (Catalina Aff., Ex. 2, at ¶ 5).

28.    For example, the position of Expediter requires contact with vendors who only are available from 8:00 a.m. to 5:00 p.m., Monday through Friday.  (Catalina Aff., Ex. 2, at ¶ ).  As a result, employees who are Expediters often only work those hours.  (Catalina Aff., Ex. 2, at ¶ ).  Nevertheless, Expediters still are required to be flexible to work during other hours, should such a staffing need arise. (Catalina Aff., Ex. 2, at ¶ 6).  Another such position is that of "Pro Cashier." (Catalina Aff., Ex. 2, at ¶ 6).  Pro Cashier is a cashier who works at the Pro Desk, which is where contractors make their purchases.  (Catalina Aff., Ex. 2, at ¶ 6). Pro Cashiers work either from 6:00 a.m. to 3:00 p.m. or 9:00 a.m. to 6:00 p.m., Monday through Friday, because these are the only times when the Pro Desk is open.  (Catalina Aff., Ex. 2, at ¶ 6).

29.    Plaintiff never has expressed interest in any of these positions or in a part-time schedule. (Catalina Aff., Ex. 2, at ¶ 5).

30.    Plaintiff testified as to four female employees whom, he alleges, were granted fixed schedules in connection with child care needs in 2003: Amy Boyer, Dotti Johnson, Meg Giroux, and Marsha Duval.  (Boutin Dep., Ex. 1, at 20-21, 81-83, 104-06).

31.    Two of these associates are in one of the few positions at the store, unlike Plaintiff's position, that allowed for a somewhat regular schedule as a result of a

business need. (Boutin Dep., Ex. 1, at 81-83, 104-06; Catalina Aff. at ¶ 6). Specifically, Amy Boyer was an Expediter. (Boutin Dep., Ex. 1, at 82; Catalina Aff., Ex. 2, at ¶ 6). Dotti Johnson was a Pro Cashier. (Boutin Dep., Ex. 1, at 83; Catalina Aff., Ex. 2, at ¶ 6).

32. The remaining two associates Plaintiff named, Meg Giroux and Marsha Duval, are part-time associates. (Boutin Dep., Ex. 1, at 20-21, 104-06; Catalina Aff., Ex. 2, at ¶ 6). Again, part-time employees are permitted to have fixed schedules. (Catalina Aff., Ex. 2, at ¶ 6).

Plaintiff's Alleged Medical Condition And Emotional Distress

33. Plaintiff first saw a doctor or therapist for depression and anxiety in 1997. (Boutin Dep., Ex. 1, at 91). Plaintiff was treated by this unnamed doctor for three to six months on a monthly basis for the sole purpose of refilling prescriptions. (Boutin Dep., Ex. 1, at 91-92).

34. In March 2002, Plaintiff began treatment with Dr. Schuyler Whitman for purposes of obtaining medication to treat depression and anxiety. (Boutin Dep., Ex. 1, at 92-94; Ex. 7). Plaintiff saw Dr. Whitman every two months until September 2002, at which time they began to meet every three months, to monitor Plaintiff and the effectiveness of his medications. (Ex. 7).

35. Plaintiff never saw any physician or counselor for therapy (other than to monitor medications as explained above). (Exs. 7, 9).

36. Plaintiff is treated for his anxiety and depression with medication. From at least 2002 to the present, Plaintiff has taken Wellbutrin, an anti-depressant. (Boutin Dep., Ex. 1, at 77-78; Exs. 7, 9). Since May 2003, Plaintiff also has been treated

with Valium (also referred to as Diazepam). (Boutin Dep., Ex. 1, at 77-78; Dr. Whitman note dated May 12, 2003 at Ex. 7).

37. Specifically relative to the relevant time period, Summer 2003, Plaintiff's medical records reveal that the medication alleviated any sleep and anxiety problems he had and generally was helping him. (Dr. Whitman notes dated August 4, 2003 and November 17, 2003 at Ex. 7). In fact, Plaintiff reported to Dr. White that "things are much improved" with Wellbutrin and "the Valium helps with sleep and nighttime relaxation." (Dr. White note dated May 24, 2004 at Ex. 9).

38. Plaintiff testified his symptoms from anxiety and depression would be worse without his medications. (Boutin Dep., Ex. 1, at 102-03). Plaintiff's symptoms related to his depression and anxiety are lessened as a result of these medications. (Boutin Dep., Ex. 1, at 78).

39. Plaintiff testified his anxiety and depression affects his life is in terms of socializing. (Boutin Dep., Ex. 1, at 100-01). Plaintiff testified he does not always have "the energy or willingness to go out, do things after work. Maybe go places with my kids or have a social life of my own or attend parties." (Boutin Dep., Ex. 1, at 100-01). It also affects his life in terms of "[h]ow much energy I have to interact with the family and get things done that need to be done around the house." (Boutin Dep., Ex. 1, at 101-02).

40. Plaintiff describes the effect of the anxiety and depression on his social life and at home as "intermittent." (Boutin Dep., Ex. 1, at 101-02).

41. Plaintiff's anxiety and depression do not affect his life in any other way. (Boutin Dep. at 101-02).

Plaintiff's Allegations of Retaliation

42. After Plaintiff filed a Charge at the Massachusetts Commission Against Discrimination stemming from the denial of his schedule change request, he alleges that he suffered retaliation. (Boutin Dep., Ex. 1, at 115-16).

43. Specifically, Plaintiff believed the fact that he did not always have the level of assistance at the Phone Center Desk that he needed was in retaliation for having filed a Charge. (Boutin Dep., Ex. 1, at 115-16). When Plaintiff was asked at deposition why he thought this was in retaliation for having filed a Charge, he responded "Because I don't remember that happening before." (Boutin Dep., Ex. 1, at 116).

44. Plaintiff also believed the Day Operations Manager, Patricia LaFore, used "every opportunity to get me alone to reassert herself that she was my boss and I should be doing what she tells me." (Boutin Dep., Ex. 1, at 113-14). Finally, Plaintiff alleges Christopher Catalina, the Store Manager, told Plaintiff he "could be on the outside looking in." (Boutin Dep., Ex. 1, at 114).

45. This is the extent of Plaintiff's allegations of retaliation. (Boutin Dep., Ex. 1, at 113-16).

Respectfully submitted,

HOME DEPOT, U.S.A., INC.
By its attorneys,

/s/ Tracy Thomas Boland
Robert P. Joy (BBO No. 254820)
Joseph P. McConnell (BBO No. 566412)
Tracy Thomas Boland (BBO No. 638878)
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, Massachusetts 02109
617 523-6666

Date: September 19, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above document was served on counsel for Plaintiff, Tammy Sharif, Law Firm of Tammy Sharif, 2 Mattoon Street, Suite 2, P.O. Box 5226, Springfield, MA 01105, by electronic notification, this 19th day of September, 2006.

/s/ Tracy Thomas Boland
Tracy Thomas Boland

you some of the ground rules. As you can see, I will be asking you a series of questions. There is a court reporter here who is taking down every word that we say, so we ask that you always give verbal answers to questions rather than nodding your head or anything like that; that you speak slowly and clearly, so that she can keep up with us. You are under oath, as you know, just the same as if you were testifying in a court of law.

If you don't understand a question I ask, please ask me to rephrase it or tell me you don't understand it otherwise I will assume that you understand it. If at any time you need a break for any reason, feel free to let me know. The only thing I ask is if there is a question pending, you answer the question pending and after that you can take a break within reason. Do you have any questions for me at this time?

A. No.

Q. You understand the rules as I have outlined them?

A. Yes.

Q. Can you give me your full name?

A. Steven Alfred Boutin.

Q. And your date of birth?

A. May 4, 1956.

Q. And your social security number?

A. 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.

Q. And what is your home address?

A. 18 Dallaire Avenue.

Q. Dallaire?

A. D-a-l-l-a-i-r-e.

Q. Thank you.

A. In Chicopee, Mass. 01020.

Q. How long have you lived there?

A. One year.

Q. Do you own or rent there?

A. Own.

Q. What address did you live at prior to that?

A. 343 Steppins, S-t-e-p-p-i-n-s, Street, Chicopee. Same town, same zip code.

Q. How long were you there?

A. Eight years.

Q. Did you own that address as well?

A. Yes.

Q. Okay. Do you live at 18 Dallaire Avenue with anyone?

A. My wife and four teenagers.

Q. Good luck to you. How long have you been married?

A. One year almost.

Q. Is this your first marriage?

A. No, second.

Q. Okay. What is your wife's name?

A. Angelica.

Q. When was your first marriage?

A. 1991, I believe.

Q. When did it end?

A. 199 -- officially in court?

Q. Yeah.

A. I think it was 1996.

Q. Okay. The four teenagers are they --

A. Two are mine and two are Angelica's, brother and sister, 16 year-old twins.

Q. And how old are yours?

A. My son is 15, my daughter is 13.

Q. Okay. So are all four dependant on you for support?

A. Myself and Angelica.

Q. Yes, okay. Other than this case have you ever been a party to a lawsuit?

A. No.

Q. Have you ever testified in a lawsuit; in court or otherwise?

A. I don't remember doing so.

Q. Okay. Are you taking any medication today that would affect your ability to testify accurately and truthfully?

A. No.

Q. Are you taking any medication at all?

A. Yes.

Q. What medication are you taking?

A. Diazepam is -- that is something I take in the morning -- I take it in the evening, I took it last night, and Wellbutrin XL I took this morning. Thank you. And some cough medicine I took this morning.

Q. You take Diazepam once a day every day?

A. Yeah, in the evening.

Q. Do you take Wellbutrin once a day everyday?

A. In the morning.

Q. What is the highest level of education you have received?

A. I went to college one semester.

Q. Where did you go?

A. Holyoke Community College.

Case 3:05-cv-30162-MAP Document 16 Filed 09/19/2006 Page 2 of 24

Page 10

Q. What year did you graduate from high school?
A. 1974.
Q. What high school was that?
A. Chicopee Comprehensive.
Q. When did you first begin working at Home Depot?
A. 1991, April 1st.
Q. Where did you work prior to that? If you remember.
A. I worked at the post office.
Q. In Chicopee?
A. No, it was in Springfield at the bulk mail center. Then before that it was just various under the table bar kind of jobs.
Q. How long were you at the post office?
A. Six months I think.
Q. Why did you leave?
A. Because Home Depot was a better opportunity, I thought.
Q. Did you have any performance evaluations when you were at the post office?
A. Not that I remember.
Q. What was your first position at Home Depot in 1991 when you began there?

Page 11

A. I worked at the -- in the receiving department.
Q. Do you remember what your rate of pay was?
A. $8.50 an hour.
Q. How many hours a week did you work?
A. 40.
Q. How long did you hold that position?
A. It might have been six months before I moved into the lumber department sales position.
Q. Let me back up for a second. When you first started at Home Depot who did you interview with?
A. Richard Pass.
Q. Is he the one that hired you?
A. Yes.
Q. What was his position at the time, if you remember?
A. He was in the hiring trailer. I forget his exact title.
Q. Who was your supervisor when you worked in the receiving department?
A. My immediate supervisor was Derek Griffith, I believe. I probably have the last name wrong.
Q. That's okay, as best you can recall. So you said you think you were in that position for about

Page 12

six months and then you moved into the lumber department.
A. Yes.
Q. You were a sales associate there?
A. Yes.
Q. What were you paid there?
A. I think my rate of pay was the same at the time.
Q. How long did you hold that position?
A. Years, five -- five years maybe. I was the department head of that department at one time for a year.
Q. How long after you became an associate in that department did you become a department head?
A. I would say two or three years.
Q. Did you receive a performance review while you were an associate in lumber sales?
A. Yes.
Q. As a lumber sales associate I should ask. Yes, you did?
A. Yes.
Q. How were they; were they positive or negative?
A. They were positive.

Page 13

Q. And how about as the department head of that position -- of that department, were you reviewed on your performance?
A. Yes.
Q. Were your reviews positive or negative?
A. They were positive.
Q. When you were in the receiving department, do you recall what schedule you had; what your hours were?
A. I worked 8:00 a.m. to 5:00 p.m. Monday through Friday.
Q. You had a fixed schedule?
A. Yes.
Q. How about when you were a sales associate in lumber?
A. In the lumber department I worked a varying schedule.
Q. As a department head did you work a varying schedule as well?
A. No, by then I had a set schedule.
Q. What was your schedule as a department head?
A. I believe it was 8:30 to 5:30.
Q. Monday through Friday?
A. Monday through Friday. I think every other

weekend I would work when my daughter visited her mom. I flexed as much as I could with the schedule I had.
Q. All right. So you were a department head then in the lumber department for approximately two years?
A. One year.
Q. One year, okay. Then where did you go after that.
A. I went from the lumber department to the plumbing department, briefly, a week or two to the garden department and then back to receiving.
Q. When you were in plumbing were you an associate or a department head?
A. Associate.
Q. Why did you take a position as an associate when you had been a department head; was that voluntary?
A. Yep, I voluntarily gave up department head because I was up for promotion to assistant manager and I realized I couldn't work those hours, and so I stepped down so somebody else could be in line for the position.
Q. Did the ASM -- when I say ASM I am referring

to associate store manager -- assistant store manager, just for the record; is that what ASM stands for?
A. Yes.
Q. An ASM position requires a flexible schedule; isn't that right?
A. Yes, and more hours.
Q. Mm-hmm. Would it have been an option for you just to remain in the department head position?
A. Yes, but then it would have taken up space for somebody that might have wanted to move up. And a department head position is a step towards assistant manager, and it didn't make sense for me to clog up that position when there was other people that wanted to move up.
Q. You took a cut in pay when you took an associate position?
A. No, I didn't.
Q. So when you went from department head to associate in plumbing, you kept the same rate of pay?
A. Yes.
Q. Do you remember what that rate of pay was?
A. In between 11 and $13 an hour.

Q. Who was your immediate supervisor when you were department head of lumber?
A. Garry Perzan was my ASM.
Q. Then when you went into the plumbing department, how long did you say you were there?
A. Maybe six months.
Q. Why did you switch to the garden department after that?
A. I don't think it was voluntary. I think they asked; or they told me I was switching to garden.
Q. Do you know why?
A. They needed someone in that department, they were coming into season and they needed more people.
Q. So then you started as an associate in the garden department, and how long did you stay in that position?
A. Only a week or two. The assistant manager of garden wouldn't accommodate my schedule.
Q. Who was that at the time?
A. Jay Swartz.
Q. Would this have been the late 90s approximately?
A. Yeah, I would think.

Q. Do you have any estimate of the year?
A. Yeah.
Q. What schedule had you asked for that he wouldn't accommodate?
A. 8:30 through 5:30, Monday through Friday.
Q. Did other associates in garden have fixed schedules?
A. Not that I know of.
Q. So where did you go after garden?
A. Back to receiving.
Q. Okay. As an associate?
A. Yes.
Q. How long did you stay in that position?
A. A few years.
Q. Who was your supervisor there?
A. Jim Lassard was my immediate department head.
Q. Did you work 8:30 to 5:30 there?
A. Yes.
Q. No weekends?
A. No.
Q. When did you leave that department -- I'm sorry. You said you were there for about a few years. Where did you go after that?

Case 3:05-cv-30162-MAP Document 16 Filed 09/19/2006 Page 4 of 24

A. I broke my arm and was sent to the phone center because I was unable to do my job in receiving and...
Q. Did you object to that transfer to the phone center?
A. No, I said as long as I could keep the same hours I would do it.
Q. Who did you say that to?
A. Greg Asarian.
Q. What was his position at the time?
A. He was store manager or a co-store manager, we may have had two at the time.
Q. Do you know what year that was that you started as a phone center associate?
A. Around 2000.
Q. What did Mr. Asarian say when you told him that you needed the same hours -- the same fixed schedule?
A. Well, he didn't have a problem with it because it was suppose to be a temporary move until my arm healed.
Q. How long did you end up staying in that position?
A. Until recently. It ended up becoming a

permanent position and I was there until last year.
Q. Why did it end up becoming a permanent position --
A. They needed someone and I did a good job, so they left me there.
Q. You didn't object to working in that position, did you?
A. No.
Q. Was Greg Asarian -- he wasn't your immediate supervisor, I take it, while you were in that position. He was store manager you thought?
A. Yes.
Q. So who was your immediate supervisor when you began at the phone center?
A. Tom Gagadowski.
Q. He was the department head?
A. Yes.
Q. Was he the department head the whole time you were there?
A. No.
Q. Who was after him?
A. They discontinued that position and made the department head of the service desk our immediate supervisor and they have been -- there was a few.

Two woman I can think of and then Steve Hardy. After Steven, I think, came Dori Farrington.
Q. Do you know who the two woman were before Steve?
A. I forget. I forget their names. I think one was Michelle who now works in our Connecticut stores. I think one's name was Laura. She was arrested for stealing from the company.
Q. Did either of -- well, let's start with Tom Gagadowski. Did he have any problem with your fixed schedule?
A. No. No, he was a good boss.
Q. Did other people in the phone center have fixed schedules in 2000 when you started there?
A. I don't believe so.
Q. Anyone else that worked in the phone center who had a fixed schedule at any time when you worked in that position?
A. Possibly one.
Q. Who?
A. Marsha. I don't remember her last name.
Q. Do you remember when she was there?
A. She is still there. She works every other Sunday or every Sunday. I can't remember her last

name.
Q. Do you know what her fixed schedule was?
A. She has been there since the store opened. No. No, I'm not even positive she had a set schedule. But if anyone did it was her, she has been there for so long. And she was -- she had some medical needs at home with her husband or something.
Q. All right. What were you making when you left the phone center department?
A. For money?
Q. Yeah.
A. Per hour?
Q. Yeah?
A. 17.20.
Q. 40 hours per week?
A. Yes.
Q. Where did you go when you left there last year?
A. To the kitchen design department.
Q. Was that a voluntary decision?
A. Yes.
Q. Why did you make that move?
A. It was offered to me and it was something I had wanted.

Q. Who offered it?
A. Chris Catalina.
Q. And have you continued your fixed schedule within that position?
A. Yes.
Q. Same hours?
A. Yes.
Q. 8:30 to 5:30. What do you make in the kitchen design department?
A. At the moment, I have gotten a raise recently, it is still between 11 -- I'm sorry. Between 17 and $18 an hour, I don't remember off hand.
Q. Why were you interested in that position?
A. Because positions have hourly caps now that they didn't use to have. Once you reach that cap in your position, you can no longer receive hourly increases, and I had been capped at my old position for years.
Q. What is the cap in kitchen design?
A. I'm not sure.
Q. But you haven't reached it yet?
A. No.
Q. Who is your immediate supervisor in kitchen

design?
A. Robert Parent.
Q. Are there any other employees that work in kitchen design that have a fixed schedule like you?
A. Not full-time. But I believe there is some part-time associates that do.
Q. When you first joined Home Depot do you recall going to an orientation?
A. Yes.
Q. What do you remember about the topics covered in that orientation?
A. 15 years ago.
Q. So whatever you can remember.
A. Various safety issues and policies, nothing specific though.
Q. Did you receive copies of Home Depot's policies?
A. Yes.
Q. How about an employee handbook or manual?
A. Yes.
Q. You were made aware against Home Depot's policy against discrimination during that orientation?
A. I don't recall.

Q. Are you aware of it today?
A. I have read it, yes.
Q. How about the open door policy, are you familiar with that?
A. I believe I have read that.
Q. What do you remember it to stand for?
A. That at any time I could talk to management about any problem.
Q. Have you received other training since orientation?
A. Yes.
Q. What trainings can you remember?
A. Equipment training, lift equipment, forklift, various machines, safety training, Haz-Mat training.
Q. Anything else that you can remember?
A. Some product knowledge classes.
(Exhibit 1 marked for identification.)
Q. I am giving you what has been marked as Exhibit 1. Take a minute to review it, please.
A. I think I left my glasses in the car.
Q. Is that going to be a problem for you? Because there are a few documents for you to look at.

A. I think I can get through it.
Q. Okay, well let me know if you can't and we will take a break.
A. Okay. Are you asking me if I remember this?
Q. Have you seen that before? I will ask you that first.
A. Yes, I must have.
Q. Is that your signature on the back?
A. Yes, but I don't really remember it.
Q. Does it appear to be a checklist of things you learned about during your orientation?
A. Yes.
Q. Do you see on the first page under company policy and philosophy references to the, quote, open door policy and equal employment policy?
A. Yes.
Q. So you would agree that you were trained on those policies during your orientation?
A. No, I wouldn't necessarily agree to that.
Q. Are those your initials S-B next to open door policy?
A. Yes.
Q. Are those your initials S-B next to the equal employment?

Page 26

A. Yes.
Q. And S-B next to Haz-Mat, are those your initials?
A. Yes.
Q. Do you have any reason to think you did not receive training on these policies?
A. Because I don't remember this form specifically and we were asked to sign and initial many things that we didn't cover.
Q. Mm-hmm.
A. It wasn't unusual for them to just give us a form and say sign them or initial them.
Q. When was your daughter born?
A. 1992.
Q. How about your son?
A. 1990.
Q. Are both children from the same mother -- have the same mother?
A. No.
Q. Whose mother is your daughter's?
A. My ex-wife.
Q. What is her name?
A. Darlene Buoniconti.
Q. Can you spell that please.

Page 27

A. B-u-o-n-i-c-o-n-t-i.
Q. And who is your son's mother?
A. Linda McKenzie, M-c-K-e-n-z-i-e. She is remarried, so now she uses McKenzie-Rivets.
Q. Where your ever married to Mrs. McKenzie-Rivets
A. No.
Q. So when we talked about your divorce previously that was from Darlene?
A. Yes.
Q. So you were divorced in 1996 I think you said, right?
A. I believe that was when it was final.
Q. At what point -- from what time did you have physical custody of your daughter?
A. 1993.
Q. So you were separated from your wife?
A. Yes.
Q. When did the separation start?
A. Well, I got custody of my daughter in October of 1993.
Q. So you weren't living with your wife as of October 1993?
A. Correct.

Page 28

Q. Did you have shared custody of your daughter in '93 or did you have full custody?
A. I had sole physical and legal custody.
Q. Did your daughter's mother visit with her at all in '93?
A. She did have visitations.
Q. What was her visitation schedule?
A. I believe it was twice during the week and every other weekend.
Q. Was it supervised visitation?
A. No.
Q. How long did that schedule continue, that visitation schedule that you just described?
A. Well, it was in effect until recently.
Q. Until when?
A. Recently I went to court with an agreement with my ex-wife that our custody be shared equally. There were no more visitation guidelines, that we would share as equally as possible.
Q. How do you work that out in terms of, you know, time with one parent versus the other?
A. Mostly her mom sees her after school Monday, Wednesday and Friday and every other weekend.
Q. Does she pick her up from school?

Page 29

A. Yes, at the bus stop.
Q. What time is that that she picks her up?
A. Around 2:30.
Q. What time does she return your daughter to you?
A. I have to pick her up after work.
Q. What time have you worked out for you to pick her up?
A. Well, after I leave work by the time I get to her house it is about 6:00.
Q. Does your wife -- your ex-wife, I'm sorry. Does your ex-wife work?
A. Yes.
Q. Do you know what her work schedule is?
A. She works nights. I believe it is an 11:00 to 7:00 shift.
Q. Where is that; where does she work?
A. It is a hospital on State Street in Springfield. I forget the name of it.
Q. What does she do?
A. I believe she is a nurse's assistant.
Q. Where does your ex-wife live?
A. In Springfield.
Q. When you say that you started that

Case 3:05-cv-30162-MAP Document 16 Filed 09/19/2006 Page 7 of 24

arrangement recently, that you just described, was it in the past six months?
A. Yes.
Q. Past month?
A. No.
Q. I am just trying to get an idea of when it was.
A. In the last six months. We didn't change anything, we just changed it on paper.
Q. When you say you didn't change anything just changed it on paper, you had this arrangement going prior to the official change?
A. Yes, three years.
Q. When did this arrangement that you just described for the split between you and your wife, when did that start; what year?
A. Well, like I said, the original visitation was twice a week and every other weekend. Now we are just doing three times a week and every other weekend. That might have started four years ago. It really hasn't changed that much over the years.
Q. So prior to 2003 you were doing this?
A. Yes, I think so. Yeah.
Q. Mm-hmm. Okay. When you say that your

daughter is with your ex-wife every other weekend, when does the weekend start?
A. When she picks her up from the bus stop on Friday until 6:00 on Sunday when I pick her up.
Q. 6:00 p.m. on Sunday is when you pick her up?
A. Yes.
Q. What prompted you to make the change from two days a week to three days a week for your wife's -- ex-wife's visitation.
A. I think they wanted to visit more often and it was -- it is basically they just wanted to visit more often.
Q. What prompted you to make the change legally, if you will?
A. In the last six months?
Q. Mm-hmm.
A. It was important to her mom, my ex-wife. It was always important to her that on paper, on record, that she have equal custody. I had given her shared legal or shared physical custody a few years ago, and it was important to her that eventually she had full custody because she was such an easy person to get along with. Because we got along so well I agreed to this because it was

important to her. I thought it would be important to my daughter someday to know that her parents had equal rights to her on paper.
(Exhibit 2 marked for identification.)
Q. I am giving you what has been marked as Exhibit 2. Do you recognize this?
A. Yeah.
Q. Did you create this document?
A. Yes.
Q. That is your handwriting?
A. Yes.
Q. I take it your daughter's name is Laura?
A. Yes.
Q. We'll talk about the incident -- strike that. We'll talk about the request you made for a schedule change in 2003 in more detail in a moment. But let me just establish for the record that your lawsuit does stem primarily from your request for a schedule change in June of 2003. Am I right about that?
A. That it all refers back to the set schedule that I say I had --
Q. Right.
A. -- I was given in 2003. I'm sorry, could

you repeat that for me.
Q. Sure, that is -- my question is whether -- isn't it true that the lawsuit we're here for today stems for a request that you made and a request that was denied for a schedule change in the summer of 2003?
A. I would say it is more than that.
Q. Was that the precipitating factor?
A. That is what started this, yes.
Q. Okay, we'll have a chance to talk about that more. The schedule that you just described where your ex-wife picks up your daughter Monday, Wednesday and Friday at the bus stop and has custody of her every other weekend, that was in existence at that time, the summer of 2003, right?
A. Yes.
Q. And at the time your wife was starting her night shift at 11:00 p.m. as far as you know?
A. I think so.
Q. Why was it, a requirement for you then, at that time, to leave work at 5:30 everyday?
A. Well, I had my son several days a week too. That was dependant on whenever his mother let me see him. And it just seemed easier to have the schedule

Case 3:05-cv-30162-MAP Document 16 Filed 09/19/2006 Page 8 of 24

the same all of the time. It made more sense to me to have a set schedule everyday than have 8:30 to 5:30 then 11:00 to 8:00, 8:30 to 5:30 and then 11:00 to 8:00.

It didn't make sense because I still had to get my daughter home at a decent hour everyday. She couldn't stay with her mother overnight and still go to school living in different towns. I don't know how else I could have managed everything with the children's school schedule. To me that is the only schedule that made sense and worked for the children.

Q. But it was possible for your wife to stay with your daughter later than 6:00 p.m., correct?

A. It was possible, but I still had to get her off to school at a certain time every morning and get her home at a time that made sense every night.

Q. What about the weekend that your wife -- your ex-wife had your daughter for the entire weekend, why was it impossible for you to work those weekends?

A. Sometimes I had my son. And sometimes we had to switch those weekends when my daughter was playing sports. And sometimes it didn't make sense

and we would do two or three weekends in a row with her. And since it changed all of the time I found it harder to ask for changes at Home Depot then to keep a set schedule. It was harder for me to anticipate a basketball tournament out of town or her mother's special needs. It just made more sense to have one set schedule then to keep asking for changes all of the time.

Q. Do other people at Home Depot have kids?

A. Yes.

Q. How do they do it?

A. Well, quite a few of them have set schedules, they have positions where you can have a set schedule.

Q. Okay, aside from those positions, are there other employees that have set schedules?

A. Yes.

Q. Who?

A. Aside from --

Q. Aside from -- we will talk about it in more detail, the categories of jobs that have set schedules, but how about in the phone center does anyone there -- I think you testified earlier that there was no one there that has a set schedule,

right?

A. Well, just possible that older woman with her husband.

Q. Would you agree that there are employees at Home Depot who do not have set schedules who have children?

A. Yes.

Q. When was your son born again?

A. 1990.

Q. He lives with you now, right?

A. Yes.

Q. Since when has he been living with you?

A. Two years.

Q. What is your custody arrangement with him?

A. Shared physical and legal. His mother has visitation every other weekend only.

Q. When did that start?

A. Last year.

Q. As of the summer of 2003 what was your -- how much time did you spend with your son?

A. Every other weekend and two or three times during the week.

Q. You saw him two or three times a week?

A. I think so.

Q. Is there anything that would refresh your recollection to make sure that that's accurate?

A. No, his mother was very unreliable and unpredictable as far as when I could have him and when I couldn't.

Q. But on paper you were suppose to have him every other weekend and two to three times a week as best you can recall?

A. Yeah, I believe it was two times a week and every other weekend.

Q. What days per week; was it the same every week?

A. No, no.

Q. You worked it out with his mother?

A. I just pretty much took him whenever she would let me have him.

Q. Even though legally it was suppose to be two times a week and every other weekend; is that correct?

A. Yes.

Q. When you did have him during the week, was there a typical day or two days that you had him?

A. You mean the same days every week?

Q. You know, did it typically happen on certain

days of the week?
A. It varied. He had piano lessons, he had karate. I would just take him whenever his mother let me have him.
Q. And how did it work out; what times did you pick him up; where did you pick him up?
A. Most of the time he was dropped off at my house and then I would drop him off back at his mom's.
Q. What time would his mother drop him off at your house?
A. Around 6:00 when I got home and I would bring him back about 8:00.
Q. How did it work out on the weekends that you had him; did you pick him up or did she drop him off?
A. I think I picked him up. I think a lot of times I picked up my daughter first and then I would pick him up on the way home.
Q. What time did you pick him up?
A. Probably around 6:15.
Q. On Friday?
A. Yes.
Q. When did you return him on Sunday?

A. 6:00.
Q. Was it reliable that you had him every other weekend or did that vary too?
A. It was pretty reliable.
Q. Referring back to what has been marked as Exhibit 2, we started talking about it a few minutes ago.
A. Okay.
Q. This is a list of daycare providers that your daughter has spent time with since her birth I take it?
A. Uh-huh, since I got custody of her.
Q. Starting at the bottom of the list 1993 to 1995, what does S-p-f-d stand for?
A. Springfield.
Q. Oh, I'm sorry. Springfield Day Nursery. What were the hours that were available for daycare there at that time?
A. 8:00 to 5:30 or 6:00. I think it was 8:00 to 6:00.
Q. What time did you drop your daughter off?
A. I would drop her off at 8:00 that is why I had the 8:30 start at work.
Q. You would pick her up at 6:00?

A. Yes.
Q. So when your were talking about the arrangement with Laura's mother as of 2003, I'm sorry -- strike that. We'll come back to that.
During these years 1993 to 1995 -- if you answered this already I apologize -- did your ex-wife share custody in any way at that time?
A. No.
Q. So she didn't see Laura in those years at all?
A. Well, she had visitation.
Q. Okay.
A. She had no legal custody rights, just visitation.
Q. So at that time it was two times a week and every other weekend. Do I have that right?
A. I think so.
Q. From 1993 to 1995 when Laura was at the Springfield Day Nursery on the two days per week that your wife had visitation -- your ex-wife had visitation, I apologize, did she pick her up at the daycare?
A. I think she did originally, but we had problems and eventually I think she wasn't allowed

to any more. I had to pick her up.
Q. What were the problems?
A. Her mother's behavior --
Q. What about her behavior?
A. -- towards the daycare provider. She is just -- she caused problems for the daycare provider.
Q. Can you give me some idea of what that means?
A. Just bad attitude, her language, her demeanor. It wasn't an easy transfer for the daycare provider, so it had to stop.
Q. Did the daycare provider require -- strike that. Did the daycare provider ban Laura's mother from the daycare?
A. Well, she did complain. I think eventually she was forbidden to go pick her up anymore.
Q. When did that happen?
A. I would say probably '95.
Q. Okay.
A. Springfield Day Nursery is individual homes. They are ladies that open their homes, they are part of the Springfield Day Nursery System. So Laura had more than one provider that belonged to that system

Case 3:05-cv-30162-MAP Document 16 Filed 09/19/2006 Page 10 of 24

over the two or three years that she went there. So she had problems with one more than she had with another.
Q. In 1993 when your ex-wife was picking her -- Laura up at the daycare and before any of those problems arose, she was able to pick her up and bring her home for the two times per week that she had her, right?
A. Yes.
Q. Do you have other family members in Massachusetts?
A. Yes.
Q. Near where you live?
A. I think my brother is in Springfield. Now he recently moved back from out of state.
Q. How about in 2003 who did you have -- what family members --
A. 2003?
Q. -- did you have in Massachusetts? Yeah.
A. My mother lived in Wales. She still does.
Q. Was she involved in -- I'm sorry go ahead.
A. It is about a 45 minute drive.
Q. From where you lived. Anybody else?
A. No, not immediate family.

Q. Anybody you could rely on for assistance with your childcare needs?
A. No, relied on friends more than family.
Q. How often did you rely on friends to help you with your childcare needs?
A. Not very often.
Q. Moving to the top item on Exhibit No. 2, from 2001 to 2004 apparently your daughter was cared for by Lizette Lassard and Brenda Perry; is that right?
A. Yeah.
Q. Who were they?
A. Friends. One was a neighbor and one was a friend. I would have to correct my last statement. I did rely on them up to 2004 to watch Laura.
Q. So in 2003 are these the two people that took care of Laura?
A. Yes.
Q. And Lizette Lassard, she is -- was your neighbor at that time?
A. Yes.
Q. Did she live literally right next door to you?
A. Well, three or four houses up the street,

but mostly it was Brenda Perry.
Q. Let's stick with Lizette for a second. What were the arrangements with her for Laura's care?
A. Laura would walk to her house because the school was right down the street. Laura would walk to her house after school and stay there until I got out of work around 6:00.
Q. When did Laura get out of school in 2003?
A. I think it was closer to 3:00.
Q. In 2003 on the days -- strike that. In 2003 on the days that your ex-wife was picking up Laura for the two times per week that she visited with her, did she pick her up at Lizette's house when she was there?
A. No, she would pick her up at school.
Q. So on those days Laura didn't go to Lizette's house?
A. Correct.
Q. On the days that Laura did go to Lizette's house, the days that you picked her up after you got out of work, was there a time that you had to be there?
A. 6:00.
Q. That was by agreement with Lizette?

A. Yes.
Q. Did you pay her?
A. Yes.
Q. What did you pay her?
A. I believe it was $5 an hour.
Q. Did Lizette work at the time in 2003?
A. Lizette has a daycare, she -- her house is a daycare.
Q. In her home. Do you know if there were any other kids who stayed past 6:00?
A. Not that I know of because most of the children were gone by the time I got there.
Q. And Brenda Perry, was Laura cared for by Brenda Perry at the same time that she was staying at Lizette's in a different capacity, or were they at different times?
A. No, before. It was different times.
Q. So what year or what time period did Laura go to Lizette's house after school?
A. Not for very long maybe one year.
Q. Do you know what year it was?
A. Maybe the final year 2004. It stopped when she was 12. She would just stay by herself after that.

Case 3:05-cv-30162-MAP Document 16 Filed 09/19/2006 Page 11 of 24

Q. All right. And I just want to be clear for the record. I was asking you questions in connection with the time that Laura spent at Lizette's for 2003 and you were answering, so I was under the assumption that she was at Lizette's in the summer of 2003; is that incorrect?

A. I think it was probably 2004. She was probably at Brenda's in 2003.

Q. Where did Brenda Perry live?

A. A few miles from our house, but her daughter went to the same school, so she would pick up Laura.

Q. How did you know Ms. Perry?

A. She was Laura's basketball coach.

Q. At what point did you ask Ms. Perry to pick up your daughter?

A. Well, sometime in 2001.

Q. Ms. Perry did this for approximately two years?

A. Yeah.

Q. Did she pick up -- did Ms. Perry pick up Laura when she picked up her own daughter every day that your wife did not pick up Laura?

A. Yes.

Q. She would -- Ms. Perry would take Laura back

to her house; is that right?

A. Yes.

Q. Then you would pick Laura up --

A. Yes.

Q. -- at Ms. Perry's house?

A. Around 6:00 when I could get there after work.

Q. Mr. Perry didn't care for any other children then?

A. No.

Q. Laura was the only other child she was caring for?

A. No, she did care for a younger child, too.

Q. For the same hours?

A. I'm not sure what the hours were. This was an infant, a toddler.

Q. Okay. Did you employ any other babysitters in 2003, the summer of 2003?

A. No.

MS. BOLAND: I am just going to take a five minute break and we will be right back.

(Brief Recess.)

Q. So would you agree with me, Mr. Boutin, that there were days in 2003 that you could work past

6:00 -- past 5:30; the days that your children were with their mothers?

A. Yes.

Q. And the weekends that your children were with their mothers?

A. Yes.

Q. Did you ever ask anyone at Home Depot if they would work with you to create a flexible schedule that accommodated your schedule with your children?

A. No.

Q. So is it fair to say then, do I have it right, that you have worked 8:30 to 5:30 since you started at Home Depot in 1992?

A. No.

Q. What do I have wrong about that?

A. Well, after I left the receiving department and went on the sales floor, I worked a flex schedule until I got sole custody of my daughter, and that is when the store manager said I could have the set schedule as long as I needed it, from 1993 when I got custody of my daughter.

Q. So as -- from 1993 to the present you have worked 8:30 to 5:30, Monday through Friday?

A. Yes, I would say almost without exception.

Q. Okay. Do you remember in 2002 finding out from someone at Home Depot that there was going to be a policy change that all full-time associates had to work a flexible schedule?

A. I didn't realize that was a policy change. I don't necessarily remember that.

Q. Do you know that today to be a policy at Home Depot?

A. I have seen it in writing, yes.

Q. When did you see it in writing?

A. Within the last year or two.

Q. Okay.

A. I have looked at Home Depot policies. I believe that is policy on paper.

Q. But you don't remember specifically being informed of the change in 2002?

A. No.

(Exhibit 3 marked for identification.)

Q. I will put this before you what has been marked as Exhibit 3, if you can take a moment to look at it?

A. Okay.

Q. Have you seen this before?

A. I am still reading, I am sorry.
Q. Okay, take your time.
A. No, I don't.
Q. You don't remember seeing this?
A. No.
Q. Was Penny Allen the store manager in 2002?
A. I believe so.
Q. Is that your signature at the bottom of this document?
A. No, it isn't.
Q. You're right, my mistake. Do you see that, the date is May 1, 2002?
A. Might be the first. It is hard to say. Oh, way over here, yes, okay.
Q. Okay. And in section -- the section lettered C of the document, I am just going to read from it. Do you see where it says, quote, this is to document the conversation between Steve and store manager Penny Allen that all full-time associates are full-time flexible and will be scheduled to business needs, period, end quote, do you see that?
A. Yes.
Q. Do you remember this conversation with Penny Allen?

A. No.
Q. Do you have any reason to think that this conversation did not happen?
A. Yes, my signature is not on it.
Q. Mm-hmm. Did you ever have any conversations with Penny Allen about your schedule?
A. Yes.
Q. What were those?
A. She wanted to take away my set schedule.
Q. As of when?
A. I don't remember. When she found out I had one, she didn't even realize I had one.
Q. Do you know when she found out you had one?
A. When I told our HR person, Cindy Batastoni.
Q. When did you tell her?
A. When, I don't remember.
Q. You don't know the year?
A. No, I honestly don't -- she was...
Q. Are you done with your answer?
A. Yes.
Q. When is the first time that you can remember learning that there was a policy at Home Depot that all full-time employees had to work a flexible schedule?

A. I don't remember.
Q. Was it 2002?
A. I understood that it was said to be that way; when I realized it was a policy in writing I don't remember.
Q. Mm-hmm.
A. I think it was always understood.
(Exhibit 4 marked for identification.)
Q. I am giving you what has been marked as Exhibit 4. Take a minute to look at it please?
A. Okay.
Q. Have you seen Exhibit 4 before?
A. Yes.
Q. What is it?
A. It is a note from my doctor.
Q. What is the date?
A. May 13, 2002.
Q. Does this refresh your recollection about when you found out about the new full-time flexible schedule at Home Depot?
A. Not especially.
Q. Is this the first doctors' note that you gave anyone at Home Depot?
A. I would have to look at the other three and

see the dates on those.
Q. So you remember that there were four total?
A. Yes.
(Exhibits 5, 6 and 7 marked for identification.)
Q. I am giving you three other doctors' notes that have been marked Exhibits 5, 6 and 7, respectively. Take a look at them and after you look at them, tell me if you can confirm whether the document marked as Exhibit 4 was the first doctor's note that you gave to Home Depot, please.
A. Yes, it was.
Q. Okay. You can put those others down for a minute. Is it reasonable to assume that you gave your first doctor's note May 13, 2002 in response to having learned that the new schedule that came into effect May 1st -- oh, sorry -- mid May 2002?
A. No.
Q. No, just coincidence?
A. No.
Q. What is the explanation then?
A. It had to do with them trying to change my schedule, to take away my set schedule.
Q. So do you think that Exhibit No. 4 was in response to Penny Allen's effort to change your

schedule --
A. Yes.
Q. -- that you testified about earlier?
A. Yes.
Q. Who did you give this note to?
A. I don't remember if it was Penny Allen or the HR person who was Cindy Batastoni.
Q. You think it was one of the two?
A. Yes.
Q. Do you know if you gave it to them on May 13th, the date of Exhibit 4?
A. I don't know that.
Q. Do you remember where you were at Home Depot when you provided it?
A. I believe it was faxed to the computer room.
Q. Was it faxed straight from your doctor's office?
A. Yes, I think.
Q. Do you recall any conversations with Penny about this note?
A. Yes.
Q. Tell me about the first such conversation you can recall?
A. I'm sorry, tell you about it?

Q. Tell me about the first such conversation with Penny Allen you can recall in connection with Exhibit 4?
A. I can remember her saying that this would have to be updated every so often that I was keeping my schedule, but this wasn't going to be enough to keep my schedule permanently, it would have to be updated every so often. That she would expect another note every so often, was the basic conversation.
Q. What was your response?
A. All right. That I would do whatever was required.
Q. Is that the only conversation you had with Ms. Allen around this time period related to Exhibit No. 4 and your schedule?
A. I believe so.
Q. How about Cindy --
A. Batastoni.
Q. Bagastoni?
A. Batastoni.
Q. Batastoni, the HR person, do you remember any conversations with her in connection with Exhibit No. 4?

A. No.
Q. The letter marked Exhibit No. 4 references the fact that you were at the time, quote, being treated at this clinic for depression and anxiety, end quote; when did you start treating for anxiety and depression?
A. Sometime that year or the end of the year before. I would say within six months possibly.
Q. Okay. So in the summer of 2003 you made a request for the schedule change; is that right?
A. Yes.
Q. Why did you make that request?
A. Because my daughter's school hours were going to change in the fall.
Q. What were they changing from and to?
A. Instead of going to school for 8:30, I believe the bus was going to pick her up about quarter of -- the bus would pick her up at 7:00, I believe. She was changing schools, so she would be starting school earlier.
Q. So what request did you make; what change in your hours?
A. I was asking to be changed to either 8:00 or 7:30 instead of the 8:30 start time. I don't

remember which. Ultimately I wanted the 7:30 schedule because I could get there by that time after putting my daughter on the bus. Which meant I could get out, get her back earlier.
Q. Who did you first ask for the change?
A. Dori Farrington.
Q. Who is she; what position did she hold at the time?
A. Department head.
Q. You were --
A. She was my immediate supervisor.
Q. Mm-hmm. What did you say to her when you asked her, if you can recall?
A. I asked her, any problem with me changing my hours to an earlier schedule, and she said she didn't.
Q. Was anyone else present for that conversation?
A. I don't think so.
Q. What happened after that in connection with your request?
A. I went to see Patricia LaFlore.
Q. Did Dori Farrington say that you should do that?

Case 3:05-cv-30162-MAP Document 16 Filed 09/19/2006 Page 14 of 24

Q. Did you go to her asking her for advice in connection with your schedule request?
A. I don't remember.
(Exhibit 9 marked for identification.)
Q. Can you look at what has been marked as Exhibit 9 and tell me if you have seen it before?
A. I remember seeing this.
Q. Would you agree it is a letter from Ms. Neves?
A. Yes.
Q. Regarding your scheduling concerns?
A. Yes.
Q. And dated December 23, 2003?
A. Correct.
Q. If you made your initial request for a schedule change in June of 2003 as I think you have testified, do you know what happened, if anything, in between then and December that prompted this letter from Ms. Neves?
A. A suit with the MCAD. I believe I had an attorney at the time.
Q. So you believe that Exhibit 9 was a response to your having filed a charge with the MCAD?
A. Yes.

Q. Does this refresh your memory with any conversation you had with Ms. Neves about your schedule?
A. No.
Q. Was this the first thing you heard from Ms. Neves after filing your charge?
A. It is possible.
Q. Does this letter, Exhibit 9, refresh your memory as to the hours you had requested your schedule be changed to?
A. Yeah, it does say 7:30 to 4:30, so it is possible that is what I asked for.
Q. By this letter Ms. Neves is asking you for confirmation from your doctor as to why it is necessary for you to work 7:30 to 4:30 to perform the essential functions of your position as a phone center associate; is that right?
A. That is what it says.
Q. Did you understand a flexible schedule to be an essential function of your job?
A. No.
(Exhibit 10 marked for identification.)
Q. Can you look at what has been marked as Exhibit No. 10 and tell me if you have seen that

before?
A. Yes.
Q. Would you agree it is a job description for the position you held in 2003?
A. Yes.
Q. Is that your signature on the second page?
A. Yes.
Q. At the top of the second page, do you see the section entitled, quote, minimum qualifications?
A. Yes.
Q. And that it says, quote, be able to work a flexible schedule, end quote?
A. Yes.
Q. Referring back to Exhibit 9 for a moment, the letter from Ms. Neves, did you respond to this letter in any way?
A. I may have gotten another doctor's note.
Q. The next one chronologically is what has been marked as Exhibit 6, that is March 26, 2004?
A. I don't remember. At the time I was represented and I believe my attorney did most of that.
Q. Can you look at Exhibit 6, the note, the doctor's note dated March 26, 2004?

A. Okay.
Q. Does a review of Exhibit 6 refresh your memory as to whether you responded to Ms. Neves letter?
A. I think that is Exhibit 7, that is March 26, 2004.
Q. You are right, I am wrong, my mistake. Okay, I'll restate my question. So looking at Exhibit 7 which is the doctor's note dated March 26, 2004, does that refresh your memory as to whether you responded to Ms. Neves letter?
A. That may have been.
Q. So you don't know if this was provided independent of that or in response to that letter?
A. It may have been, I don't remember.
Q. All right. Do you know who you provided Exhibit 7 to at Home Depot?
A. No.
Q. Would you agree that all of your doctor's notes relate to your schedule in connection with the care of your daughter only and not your son?
A. Correct.
Q. Well, if you're telling me that in the summer of 2003, I think you testified earlier that

in December of 2003 you had your son every other weekend and approximately two days a week. If that is true, why wasn't the childcare for your son referenced in your doctors' notes?

A. I don't know.

Q. Could it be that in 2003 care for -- the care of your son was not an issue for your schedule?

A. I'm sorry, Exhibit 6 mentions my son in the third paragraph.

Q. All right. Thank you. Exhibit 6 is dated May 17, 2004, is that right?

A. Yes.

Q. And the portion of the letter that you are referencing reads, quote, he now reports -- he being you -- that he also has to help care for his 13-year-old son who has multiple developmental disabilities, end quote. Do you see that?

A. Yes.

Q. So that was a new change, was it not?

A. A new change in the letters from the doctor?

Q. You're right. It is a bad question, I will restate it.

Is it fair to say that you did not have the same responsibilities for your son's care as of May

2004 that you did in the summer of 2003, the schedule change?

A. It did.

Q. Did that change necessitate Exhibit No. 6; is that why you obtained Exhibit No. 6 because of the change in custody with your son or arranged custody arrangements with your son?

A. I believe it was in response to something from Home Depot or something from the MCAD. I think they wanted something clarified and that is why these are so close together.

Q. These being Exhibits --

A. These notes Exhibits 6 and 7.

Q. Okay. You may have answered this already, I apologize if you did. But when did the arrangement change with your son?

A. He started living with me April of 2004 full-time.

Q. Okay. And prior to that you were still doing the every other weekend and two days a week, approximately, arrangement?

A. Right, yes.

Q. Why did that arrangement change in April of 2004?

A. His mother said she couldn't handle him anymore.

Q. What are his, quote, developmental disabilities referenced in Exhibit 6?

A. ADHD, autism, OCD. He has been diagnosed with those over the years, but I believe it is mostly ADHD, and since I have gotten him and put him on different medications, he is doing much better. But he is still a special needs child in school and he needs special services.

Q. Do you know so -- strike that. Do you have any memory as to who at Home Depot you provided Exhibit 6 to?

A. No, other than management which would include -- I would have to say Chris Catalina or Human Resources, I wouldn't give one of these notes to anyone else.

Q. So of all the four doctors' notes you provided, you think, your memory is that you gave them to Chris Catalina or someone in HR?

A. Yes, or Penny Allen.

Q. Going back to the first doctor's note, Exhibit No. 4 dated May 13, 2002, the note does not reference any medications, but were you being

treated with medications at that time?

A. Yes.

Q. What medications were you being treated with in 2002?

A. Diazepam for sure. I am not sure about the Wellbutrin.

Q. What does Diazepam treat?

A. It helps me sleep at night. It is like a generic Valium.

Q. Does it work?

A. Yep, for me.

Q. Is there anything else you can remember being on?

A. I may have been on Wellbutrin, I don't remember.

Q. Have you been on Diazepam consistently since 2002?

A. I think so.

Q. To the present day?

A. Yes, I still do.

Q. Do you know if 2002 was when you started it or were you on it prior to 2002?

A. No, I believe that was the start of it.

Q. Do you have any memory as to when you

Case 3:05-cv-30162-MAP Document 16 Filed 09/19/2006 Page 16 of 24





started on Wellbutrin --
A. No.
Q. -- the year?
A. No.
Q. It may have been 2002?
A. It may have been or we may have tried different things and eventually ended up with Wellbutrin.
Q. And you're on that now?
A. Yes.
Q. What does Wellbutrin treat?
A. It just -- I think it is basically a relaxant. It takes the edge off. Some people are prescribed it when they quit smoking I understand.
Q. Does it work for you?
A. It seems to help.
Q. Would you say that when you are taking the Diazepam and the Wellbutrin that your symptoms of anxiety and depression are alleviated?
A. I would say they are lessened.
Q. To what degree?
A. It is not a flat line. If I had to say on average 50 percent.
Q. So after all of these conversations about



your schedule in 2003 you remained working 8:30 to 5:30, Monday through Friday, right?
A. Correct.
Q. Has your schedule changed since that time?
A. No.
Q. Have you made any additional requests since 2003 for a schedule change?
A. No.
Q. How did you end up working out the schedule of your daughter's new school hours in 2003 once your request was denied?
A. When my son came to live with me the bus didn't pick him up until 8:00 --
Q. I am going to stick with 2003. Your son wasn't living with you in 2003, right?
A. Okay.
Q. So right around the time in the summer when your were talking with people at Home Depot about your change and then found out that the schedule change would be denied, and your daughter's school hours, as you told me, would change that coming fall, how did you work it out that you were able to pick her up or drop her off or whatnot?
A. Well, the school bus still picked her up



around 7:00. I just didn't go to work until 8:30. So I had some free time that I considered kind of a waste of time hanging around waiting for work. And until she was 12, she still went to a friend or a neighbor to be watched after school.
Q. So not getting the schedule change that you wanted really did not impact your daughter's ride in any way, you are still able to get her to school, pick her up after school, after your shift, right?
A. Yes, she was just with someone else after school longer than she used to be.
Q. A half hour longer?
A. Half hour to an hour by the time the bus dropped her off.
Q. What time was she getting to the friend's house who was watching her after this change in her hours after school -- strike that, that is a bad question.
After her hours changed in the fall of 2003, what time did she get to the house where she was being watched.
A. 2:30 I think.
Q. I think you testified previously that before that she was getting there at 3:00, is that right,



when she got out of her other school?
A. That is when she got out of her other school, yeah. So that would have been a little later than 3:00 by the time she walked there.
Q. Since 2002, do you know of any other associates that requested a schedule change to accommodate childcare needs?
A. Yes.
Q. Who?
A. I don't know if I want to say any names at this time.
Q. Your attorney can --
MS. BOLAND: Do you want to take a break about his obligations to answer my questions unless you instruct him otherwise.
MS. SHARIF: Yes.
MS. BOLAND: I will show you a conference room.
(Brief Recess.)
(Reporter read back portion of testimony.)
Q. Can you answer that question now?
A. Sorry, I just was afraid that other people might lose any special considerations they're getting because I am mentioning their name. I think

Case 3:05-cv-30162-MAP Document 16 Filed 09/19/2006 Page 17 of 24

that has happened since I filed this suit, that some people have lost considerations they used to get. I am not positive of the dates 2002 until now, but I know it has happened with Amy Boyer.
Q. Well we will take one at a time.
A. Okay.
Q. Was Amy Boyer employed in 2003?
A. Oh, yeah.
Q. What position did she hold then?
A. She was an expediter.
Q. She was an expediter then?
A. Yes.
Q. So you believe she had a fixed schedule?
A. She had fixed schedule and she would change it according to her daycare needs.
Q. What was her schedule, do you know?
A. I don't remember. I do remember she changed it once by a half hour this way, and she changed it again by a half hour that way. As her daycare needs changed she just was allowed to change her schedule by a half an hour or an hour. She put in her eight hours in the morning, but her start and end time would change.
Q. Mm-hmm, okay. Who is the next person?

A. Beatrice Agosto.
Q. Was she employed there in 2003?
A. Yes.
Q. What department was she in?
A. She was in the flooring department.
Q. Is she an associate or was she an associate then.
A. Associate, yep.
Q. She had a fixed schedule in 2003?
A. Not a fixed schedule, but she was getting scheduling considerations. It wasn't fixed like mine were. It was the same everyday, but they worked around her daycare needs.
Q. Who else?
A. There was Dotti Johnson. She had a sick parent she took care of. I don't know if this just involves children, but she had a set schedule so she could care for her sick parent.
Q. She had a fixed schedule?
A. Yes.
Q. Do you know what it was?
A. No, I don't.
Q. What department was she in?
A. She was a cashier.

Q. In 2003 this was all the case?
A. 2003.
Q. Anybody else?
A. No one that really comes to mind. To be honest I didn't come here prepared to present evidence, so I am sure if I was given time to think, maybe I can think of some others.
Q. Well, we are going to take a lunch break soon and maybe you can think during that time. Is there anything else that would refresh your recollection of other people who had that fixed schedule?
A. Not at this time.
Q. Other than requests relating to your schedule change, have you made any requests to anyone at Home Depot for any other type of accommodation?
A. I have been trying to get a different position for years out of the phone center.
Q. We'll talk about that in a second. I am asking you specifically for not a change in your position but an accommodation for your alleged disability?
A. Other than my schedule?

Q. Yep.
A. No.
Q. You have mentioned that you have been trying to get a different position for years; is that what you said?
A. Yes.
Q. What position is that?
A. Well, there have been a few that I have inquired about that have set schedules and some that don't.
Q. Tell me each of those.
A. Well, one was pro desk associate.
Q. When was that available?
A. A few years ago. Actually they gave it to my wife.
Q. Does the pro desk associate have a fixed schedule?
A. At that time, yes.
Q. You say a few years ago, so do you think it was 2003 approximately?
A. I think so.
Q. Are you familiar with the JPP?
A. Yes.
Q. Did you enter into the JPP for that

Case 3:05-cv-30162-MAP Document 16 Filed 09/19/2006 Page 18 of 24

Page 90

A. Well, he had shown up at the MCAD hearings and so did Ms. Neves.
Q. Okay. Going back to the positions you applied for, you mentioned the pro desk associate and the expediter positions. Were there any other positions that you applied for since then that you haven't received?
A. I don't remember any. I remember asking about sales positions on the floor, but very few of those come with set schedules. Some of them do, but that is the exception.
Q. Did you enter into JPP for any of those?
A. Yes.
Q. When?
A. It has been there since the wage cap went into effect. I have been in the JPP for another position in sales, on the floor or just about anything, expediter, sales in hardware, sales in building materials and electrical and kitchen.
Q. Did you interview for any of your positions?
A. No.
Q. So at some point then you entered into the JPP for the kitchen design position that you have now, right?

Page 91

A. Yeah, I think I have been in there always.
Q. When you say that you mean that you had a registration in JPP for that position?
A. Yeah.
Q. When were you interviewed for that position?
A. Last year.
Q. Who were you interviewed by?
A. Chris Catalina.
Q. You ultimately were given that position, right?
A. Yes.
Q. What do you believe that your anxiety and depression stems from?
A. Family history.
Q. As an adult, as a child or both?
A. Both.
Q. I think you have testified earlier that you think the first time you saw a doctor or therapist for this anxiety and depression was approximately 1997; is that right?
A. Yeah, that could be, yes.
Q. Do you have any memory as to how long you saw a doctor for therapy?
A. It was just for three to six months.

Page 92

Q. How often did you see the doctor? Was it a doctor or a therapist?
A. It was a doctor. Just for different prescriptions.
Q. Did you go to see this doctor on a regular basis?
A. No, it was like once a month just to let them know how the prescription worked and maybe we should try something different. Eventually I gave up.
Q. Why did you give up?
A. I don't remember.
Q. You don't have any further memory as to the name of that doctor?
A. No.
Q. Do you have any records at home that would refresh your memory?
A. No. No, I think it was even multiple doctors. You know when you feel bad and you go to the doctors and you try something and it makes you feel worse, you get tired of trying after awhile and you just settle for the way you feel that you're used to.
Q. When you say --

Page 93

A. And I think that is what I did.
Q. When you say it was multiple, doctors within the same practice or separate doctors?
A. I don't remember.
Q. Then you believe it was 2002 that you started seeing Doctor Whitman; is that right?
A. Yes.
Q. How regularly do you see Doctor Whitman?
A. I think it was every three months eventually. I think it started out once a month and was every three months and eventually not at all; because Service Net, apparently their new policy is unless there is counseling involved they don't handle the patient. As far as prescribing medications, they wanted your primary care physician to unless you want counseling and I didn't want counseling.
Q. So let's start at the beginning then. In 2002 when you started seeing him, at that time you were going to see him once a month you think?
A. Well, she is she.
Q. I'm sorry.
A. Yeah, I think it was every month until the medications began to help.

Q. So you started with the medications that you referenced earlier right when you started seeing her in 2002?
A. I don't remember which ones we started with. The ones I take now, once we ended up with those, we kind of settled on these and I saw her every three months.
Q. When did that stop?
A. Last -- last year.
Q. That is when Service Net's policy changed?
A. Yes.
Q. Is Service Net the insurance provider or the service where you go for the treatment?
A. It was a facility.
Q. Where is Service Net located?
A. Well, their main office is North Hampton, but they had another office in Chicopee I would go to.
Q. How did you find out about Service Net?
A. I don't remember.
Q. Do you have a primary care physician?
A. Yep.
Q. Who is that?
A. I forget. I don't remember her name. She

is at Riverbend Medical Center in Chicopee. I'll try to remember her name. It is Middle Eastern, I forget?
Q. Do you have anything at home that would --
A. Yeah, it would be on my prescription bottle.
MS. BOLAND: I would ask that you provide that information, Tammy.
Q. How long have you been seeing the doctor at Riverbend who is your primary care?
A. Only since -- I had to see her for the medications for the --
Q. So approximately some -- sometime in 2005 that happened.
A. Yep, sometime last year.
Q. Other than seeing these doctors to obtain the medications you're on, have you ever received any counseling services?
A. No.
Q. Are there any other doctors in the past ten years that you saw for any reason, medical, emotional, mental?
A. Well, I saw for that -- I forgot his title. That celiac disease. I saw someone for that in the early 90s.

Q. Anybody else?
A. No, I don't think so.
Q. Who at Home Depot have you told about your alleged disability at any time?
A. I don't think I have told anyone directly. I think that I have had some people come to me that have heard things, but I don't think I have told anyone. It is embarrassing. I only did it because I was forced to keep my schedule.
Q. I think you have already testified that through the -- strike that. I think that you have already testified that as a result of the conversation relating to your schedule that you provided doctors' notes to Chris Catalina and Marcia Neves; is that right?
A. Yes.
Q. Who else in management knew about your alleged disability?
A. Only management knows that.
Q. Who in management, other than the people you have mentioned?
A. I don't know because no one else in management ever talked to me about it.
Q. I am just asking for who you -- which people

at Home Depot that you know have knowledge of your alleged disability other than Mr. Catalina and Ms. Neves?
A. That is what I'm saying I don't know.
Q. Okay, you don't know of anyone else?
A. No.
MS. BOLAND: This is probably a good time for a lunch break; is that good for you, 45 minutes?
MS. SHARIF: Okay.
(Lunch Break.)
BY MS. BOLAND:
Q. Can you describe for me what your job duties were when you worked as a phone sales associate?
A. Answering the phones, answer the peoples questions as best I could. If I could do it with a computer, I would do it with a computer. If I couldn't answer it, then I was responsible for getting them to the right place where their questions could be answered.
Q. Okay. What about kitchen designer, what are your duties there?
A. Evaluating peoples' wants and needs and designing kitchens and selling them whatever it is

Case 3:05-cv-30162-MAP Document 16 Filed 09/19/2006 Page 20 of 24

that they want basically.
Q. Mm-hmm. While you have been working in those two positions for the past several years, you've had generally positive or negative performance reviews?
A. Positive.
Q. Did your doctor who you -- any of the doctors that you have seen for anxiety and depression ever tell you not to come to work?
A. No.
Q. So your anxiety and depression have not inhibited your ability to do your job either as a phone sales associate or a kitchen designer; is that right.
A. I'd say there are times I was more capable of doing a better job or I was capable of doing more volume if I felt better. I don't always feel as good on one day as I do the next, but...
Q. Was that the case in 2003 as well?
A. I think that is on going, yeah. But I still think I do a better job than most people and all around I do a positive job. But if I feel better everyday I could work better everyday.
Q. Even though -- strike that. Even though you

think there are times at which you could do a better job than what you're doing, would you still feel that you are still able to perform the functions of your position?
A. Yes.
Q. When you are taking the medications that you have identified here today, does that affect your performance positively?
A. It helps, yes.
Q. Are there other jobs at -- within the store that are more amenable to fixed schedules than phone sales?
A. Yes.
Q. Can you tell me what -- which categories of jobs?
A. Expediter positions, IMA positions, although the hours they keep are way to early for me even though it is a set schedule. Just like night crew position, that is a set schedule, but it is nights.
Q. Mm-hmm.
A. So as far as a schedule that I could live with would be the pro desk and expediter positions.
Q. What about receiving?
A. Receiving I could do it. I would prefer not

to go back to receiving.
Q. But it would work with your schedule demands?
A. Yeah, I think so. I am not sure if they have changed the way it works back there now with the hours.
Q. How about the position of will call delivery coordinator?
A. It could although it seems like that involves some other things too. The one we have now does more than just that. She does some training and some HR duties.
Q. Which of the positions that we just listed would you consider yourself qualified for, setting aside the schedule issue?
A. All of them.
Q. Does your anxiety and depression substantially limit your ability to do anything in your life?
A. Sometimes.
Q. What things?
A. Socializing.
Q. What do you mean by that?
A. Having the energy or the willingness to go

out do things after work. Maybe go places with my kids or have a social life of my own or attend parties. Basically sometimes I am just to tired to do anything, but work and go home and do the basics.
Q. Is that a result of your anxiety and depression or just being tired?
A. Being tired is part of the anxiety and depression problem.
Q. How often would you say you experience the effects on your ability to socialize from your anxiety and depression, is it daily, weekly, intermittent?
A. I would say intermittent.
Q. But it is not daily?
A. No.
Q. Weekly?
A. I don't feel the same daily or weekly. And I don't socialize that much anyway. I have kids and I don't have a lot of money. When do I have time to socialize?
(Discussion off the record.)
A. But I feel like maybe I should do more with my kids sometimes.
Q. What else? Is there any other aspect of

your life that your anxiety and depression substantially limits your ability to do?
A. Besides social, it is home.
Q. What at home?
A. I should have said home first. How much energy I have to interact with the family and get things done that need to be done around the house.
Q. Is that on a daily basis that you feel that way?
A. I would say that is intermittent also, good days, bad days.
Q. Anything else?
A. Between home or going out, no, I can't think of anything off hand.
Q. Again do you take your medications that you have identified that you're on now, do you take those regularly --
A. Yes.
Q. -- and consistently, I should say?
A. Yes, yes.
Q. Do you ever miss days that you don't take them?
A. No.
Q. So what you have just described in terms of

the way your anxiety and depression affects your life is the way it affects your life while you are medicated; is that right?
A. Yep, I think it would be worse without it. It was worse without it.
Q. And for how many years would you say your ability to socialize and do things at home has been affected by your anxiety and depression in the way that you just described?
A. My whole life. I just didn't realize it.
Q. When did you start to realize it?
A. When I found something that made me feel better and I knew how bad I was feeling. I always knew there was a problem. I just didn't know what to blame it on or how to fix it.
Q. When did you come to that realization; is it when you started seeking treatment?
A. Yeah, I would have to say within the last three years when we hit on this combination of drugs.
(Exhibit 11 marked for identification.)
Q. And I am handing you what has been marked as Exhibit 11. Can you take a look at it and tell me if you recognize it?

A. Yes.
Q. What do you recognize it to be?
A. What do I recognize it to be?
Q. Yeah.
A. An amended complaint drawn up by my attorney.
Q. Okay. Could you look at paragraph number 36, please?
A. Yes.
Q. You allege there that you were, quote, subjected to discrimination because of his disability and gender, end quote; is that right?
A. Yes.
Q. What discrimination against you on the basis of your gender are you alleging?
A. That we had female employees that were accommodated with childcare issues and other issues. Their schedule was accommodated while mine wasn't.
Q. Those are the individuals that you identified previously today?
A. Well, those are some of them.
Q. Amy Boyer, Beatrice Agosto and Dotti Johnson?
A. Yeah, those are some of them.

Q. Are there more that you can remember today?
A. Not off the top of my head. Not by name. I didn't really come prepared to give any evidence.
Q. Well, your attorney can explain to you in more detail that is your role here today.
MS. BOLAND: And Tammy, I would ask that this information is certainly responsive to our discovery, our written discovery, to date. So that you work with your client to see if there is anything that can refresh his recollection as to other females who were supposedly given childcare adjustments that he was not in response to our interrogatories and request for documents.
A. I would say -- well, if you still would like a name.
Q. Mm-hmm.
A. Meg Giroux, she is an expediter.
Q. What is her last name; can you spell it?
A. Giroux, G-i-r-o-u-x. She became part-time after she had her baby and she got it in writing that her hours were not going to change or be reduced.
Q. As a part-time employee?
A. Yeah, because most part-time employees if

not all of them have their hours reduced, when business is slow -- and she keeps her part-time hours exactly the way she wants them -- those have changed --
Q. Was that her position --
A. -- on occasion.
Q. I'm sorry I didn't mean to interrupt you.
A. No, that has been her position ever since she went part-time, years.
Q. Was that the case in 2003 for her?
A. Yes, she still has that position and she has that in writing.
Q. From who?
A. I don't know. I would think Ross Founds because I believe he was the manager at the time.
Q. Anybody else that you can remember today?
A. No, not at the moment.
Q. Looking back at Exhibit 11 again, paragraph number 53, there is an allegation that you were, quote, harassed because of your gender. What do you mean -- we just talked about the fact that you allege to have been discriminated against on the basis of your gender and you explained that. But what do you mean when you say you were harassed on

the basis of your gender?
A. I don't remember the specifics other than to say the women -- I was being harassed by women and I didn't see any women being harassed. I was harassed by Dori Farrington. I was harassed by Patricia LaFlore.
Q. Anybody else?
A. Not that I can think of.
Q. What do you recall about -- strike that. In connection with Dori Farrington, how did Ms. Farrington harass you?
A. She would leave me without help, leaving me to do the job that two or three people should be doing.
Q. You think that was harassment based on your gender?
A. Yeah, she didn't seem to like men. She didn't seem to like -- most of the people in the phone center were women, the expediters and I guess there is a few other men. I got the impression she didn't like me because I was a man.
Q. Can you give me any specific instances of that, or that was just your feeling? Any comments or specific activities that support your belief?

A. No, I can't think of any. I would jot down notes from time to time. If I went over those, maybe I would have some specifics later on.
Q. I have some documents that might refresh your memory that we will get to in a minute. We will get back to that.
Is there anything else you can remember specifically, though, in terms of how Ms. Farrington specifically harassed you other than not leaving you with enough help on the desk?
A. It is hard to say specifically because they were really stupid things. Like Amy used to sit there on her break and watch DVD's and Dori made her sit on the other side of the room so that I couldn't see them while I was doing my job. That was stupid.
Q. Why do you think that was because of your gender?
A. I don't think the specific incidents were because of my gender. I think the fact that she was harassing me was because of my gender. Not the specific incidents she used to harass me, just the fact that she harassed me at all.
MS. SHARIF: May I have a moment with my client.

MS. BOLAND: Sure.
MS. SHARIF: Thank you.
MS. BOLAND: Sure.
(Brief Recess.)
BY MS. BOLAND:
Q. Before we took a break, Mr. Boutin, you were talking about specific instances of harassment that you can recall by Ms. Farrington. Is there anything else that you haven't already testified to that would respond to that question?
A. Just specific instances. Just a lot of nitpicking little things. Like if I put a product next to my work station so I wouldn't forget to buy it and take it home, she would say you can't do that. But she does it all of the time. And it was reported to me that she had the new person next to me spying on me. Every time I left my work station she would call him and ask him secret little questions about me. That was told to me by one of the expediters.
Q. Who was that that was suppose to spy on you?
A. His name is Dawn I forget his last name.
Q. But it is a male?
A. Yes. Yeah. Dori had her little -- she had

Case 3:05-cv-30162-MAP Document 16 Filed 09/19/2006 Page 23 of 24

her own little circle of people. She had Chris Theberge report me for-- what were the exact words -- inappropriate -- for saying something inappropriate.

Q. What do you mean when you say that Ms. Farrington had Ms. --

A. How do I say, that they were all working together to give me a hard time without just sounding like I was being paranoid. But they were good buddies and they would talk and they would whisper and she was --

Q. Go ahead.

A. -- she was one of Dori's friends and she reported me for saying something inappropriate. Even though they wouldn't tell me what she said or even that she said it.

Q. Mm-hmm.

A. It just seems to me that ever since I asked for that schedule request and I was denied the accommodation because I was a man that they were retaliating, they were keeping me in there, they were making my job just as difficult as possible hoping I would quit or give up or something.

Q. What about in connection with Ms. LaFlore,

you mentioned that she was someone who you believed harassed you because of gender; is that right?

A. Yes.

Q. And what can you tell me about that?

A. That she is gay and she doesn't seem to like me as a man and she would try to take control over me whenever nobody was around. There is like four different occasions after denying my accomodation that she pulled me aside and said, "You're going to do what I tell you to do. I am your boss and this is the way it was going to be." And I walked away from her every time and after three or four times I brought a little tape recorder to work with me and I pulled it out and I said, "Okay, now we'll talk," because she refused to talk to me in front of anybody else or in front of Chris. We never had that meeting. And she didn't act like that with women. She acted like that with me. To me it was because I was a man.

Q. That is just your assumption?

A. She never said that it was because I was a man. She just treated me differently than she treated the women.

Q. What can you tell me to support your

allegation that she never treated women the same way that she treated you?

A. There is nobody in here suing Home Depot for discrimination for not being accommodated for their schedule.

Q. That is it?

A. Maybe I can think of some other things later. I didn't come prepared, I'm sorry. For specifics, you're asking me for specifics and it has been three years.

MS. BOLAND: Let's go off the record for a second.

(Discussion off the record.)

BY MS. BOLAND:

Q. How do you know that Patricia LaFlore is gay? Did she tell you?

A. She didn't tell me, but she didn't make it a secret and I have seen her with her partner.

Q. What have you seen?

A. In the parking lot. I have seen them intimate in the parking lot.

Q. Did someone else at Home Depot tell you she was gay?

A. Everyone.

Q. Everyone?

A. It was very common. There is a lot of gay people at Home Depot. It is not a secret or something most people try to hide.

Q. How was the fact that she was gay play into your allegation that she didn't like you because you're a man?

A. I guess maybe it shouldn't, but I think it does.

Q. If you could look at Exhibit 11 paragraph 43.

A. Okay.

Q. In connection with your claim of retaliation you allege that the Defendant -- I'm sorry -- that Home Depot retaliated against you by, quote, verbally harassing you, end quote. Did you see that?

A. Yes.

Q. What verbal harassment did you suffer at Home Depot?

A. Well, specifically Patricia Laflore using every opportunity to get me alone to reassert herself that she was my boss and I should be doing what she tells me. And she was angry I went over

Page 114

her head to talk to Chris Catalina about the scheduling issue. Which I didn't understand because she told me we were going to have a meeting with him anyway.
Q. Anything else she did?
A. And Chris Catalina at one time had told me if I wasn't careful with the path I was following, I could be on the outside looking in.
Q. Anything else?
A. Nothing I can remember at the moment.
Q. Did you ever report discrimination on the basis of your disability to anybody at Home Depot? Did you ever complain about it or report it in any way?
A. Before I went to the MCAD, I don't remember.
Q. But after the MCAD charge was filed?
A. Of course they knew I did. And then they wouldn't talk to me anymore. They said now it was a legal issue.
Q. But did you ever file, whether it was formally or informally, any sort of internal complaint of disability discrimination?
A. I don't remember. I would have to see my file. I really don't remember. There have been

Page 115

times when I filed things, about things that I thought were unfair, but I don't remember if discrimination was a specific...
Q. How about discrimination on the basis of your gender, either before or after you filed the MCAD charge; did you file any complaints about that internally?
A. I don't remember.
Q. How about for retaliation, same question?
A. Retaliation before the MCAD?
Q. Or after.
A. Yeah, I did file something about retaliation.
Q. Before or --
A. After I think.
Q. Do you know who you made that complaint to?
A. Our human resource person I believe.
Q. Do you know who it was at the time?
A. It might have been Danielle Kida. It might have been Marica Neves.
Q. Was it just once that you did this or more than once?
A. At least once. I don't remember if it was more.

Page 116

Q. Do you remember what it related to; the complaint related to specifically?
A. I remember the word retaliation. I think it had to do with scheduling, was part of it. The fact that I was being left alone so much.
Q. Meaning you didn't have the assistance that your needed while you were on the job?
A. Exactly. I was having to kill myself to keep up with the work that needed to be done.
Q. Why do you think that was in retaliation for having filed a charge?
A. Because I don't remember that happening before.
Q. You have been employed at Home Depot since 1991 without interruption, right?
A. Yes.
Q. So your claim against Home Depot does not involve any claim for lost wages, correct?
A. Correct.
(Exhibit 12 marked for identification.)
Q. I am showing you what has been marked Exhibit number 12. Can you take a look at it and tell me if you recognize it?
A. Yes.

Page 117

Q. Can you turn to the second page, interrogatory number 3 and then your answer. It says, quote, equitable relief. Plaintiff is seeking a permanent, set or fixed work schedule, end quote. Do you see that?
A. Yes.
Q. You have that already, don't you?
A. There is no such thing as permanent.
Q. You have a fixed schedule?
A. Yes.
Q. You have had it for how many years?
A. Quite a few.
Q. Almost 16?
A. Quite a few. But someone tried to take it away from me more than once and it is not in writing. And I don't believe anything is permanent in Home Depot. They change their minds, they change their policies, they change their management. I don't believe I have a permanent work schedule. I think it is just there until someone changes their mind again.
Q. Can you tell me of a policy at Home Depot that is permanent, quote unquote, permanent in writing schedule for any employee?

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**STEVE BOUTIN,**

**Plaintiff,**

**v.**

**HOME DEPOT U.S.A., INC.,**

**Defendant.**

**Civil Action No. 05-30162 MAP**

**AFFIDAVIT OF CHRISTOPHER O. CATALINA**
**IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, Christopher O. Catalina, depose and state upon personal knowledge the following:

1. I am the Store Manager of the West Springfield, Massachusetts Home Depot, which is located at 179 Dagget Drive, West Springfield, Massachusetts 01089. I have held this position since 2001.

2. Steve Boutin has worked for me in this store since I began there in 1998 as an Assistant Store Manager.

3. In Summer 2003, when Mr. Boutin asked for a change in his fixed schedule, he was allowed to retain his 8:30 a.m. to 5:30 p.m. fixed schedule but we did not approve the change to the 7:30 a.m. to 4:30 p.m. fixed schedule.

4. Allowing Mr. Boutin to start work at 7:30 a.m. and leave at 4:30 p.m. would have imposed a significant problem regarding coverage at the Phone Center, where he worked at the time. The Phone Center requires coverage until 6:00 p.m. Mr. Boutin's 5:30 p.m. departure already left a half-hour void. As a result, I, and the other managers, are forced to take an employee from a different position and

place him or her at the Phone Desk for that half-hour. Not only does this disturb staffing levels, but it also results in the phones not being covered at all times, which is essential. Obviously, if Mr. Boutin were to start leaving work at 4:30 p.m., that would only exacerbate the problem. Moreover, the shifting of staffing unfairly burdens the other employees forced to cover the Phone Desk in Plaintiff's absence.

5. Since 2002, only part-time employees are allowed to have schedules that are literally "fixed" schedules, like Mr. Boutin's. No full-time employees are allowed to have absolutely fixed schedules. In other words, although certain positions are more amenable to schedules with regularity, those employees still are required to maintain flexibility to work outside of those schedules, including on weekends, should there be a business need for that. To my knowledge, Mr. Boutin never has expressed interest in any of these positions or in a part-time position.

6. Two of the employees Mr. Boutin has identified as female employees he believed were treated better than he are part-time associates and two of the associates are in one of the few positions, unlike Mr. Boutin's, that allowed for a somewhat regular schedule. Specifically, Amy Boyer was an Expediter. The position of Expediter requires contact with vendors who only are available from 8:00 a.m. to 5:00 p.m., Monday through Friday. As a result, employees who are Expediters often only work those hours. Nevertheless, Expediters still are required to be flexible to work during other hours, should such a staffing need arise. Dotti Johnson was a Pro Cashier. "Pro Cashier" is a cashier who works at the Pro Desk, which is where contractors make their purchases. Pro Cashiers work either from 6:00 a.m.

to 3:00 p.m. or 9:00 a.m. to 6:00 p.m., Monday through Friday, because these are

the only times the Pro Desk is open.  Meg Giroux and Marsha Duval are part-time

employees.  Again, part-time employees are permitted to have fixed schedules.


Signed under the pains and penalties of perjury this 19th day of September 2006.


/s/ Christopher O. Catalina
Christopher O. Catalina

Case 3:05-cv-30162-MAP Document 16-4 Filed 09/19/2006 Page 1 of 2

**Discrimination Complaint**
**Massachusetts Commission Against Discrimination**

**FEPA No.:** 03230l869
**EEOC No.:** 16CA302145

**Filing Date:** 7/16/03
**Violation Date:** July 7, 2003

RECEIVED
JUL 16 2003
COMMISSION AGAINST DISCRIMINATION/SPRINGFIELD

**Name of Aggrieved Person Or Organization:**

Steve Boutin
43 Stebbins Street
Chicopee MA 01020

**Telephone Number:**
**Home:** 413-552-0103
**Business:**

**Named is the Employer, Labor Organization, Employment Agency, or State/Local Government Agency Who Discriminated Against Me:**

Home Depot
179 Daggett Drive
West Springfield MA 01089

**Telephone Number:** 413-731-9700
**Number of Employees:** 25+

**Cause of Discrimination Based On:** Disability

**The Particulars Are:**
On July 7, 2003, Home Depot discriminated against me by subjecting me to unequal terms and conditions of my employment based on my disability (Depression/Anxiety) in violation of M.G.L.C. 151B, §4 (16), and Americans with Disabilities Act (ADA), and Gender (Male) in violation of M.G.L.C. 151B, §4 (1) and Title VII of the Civil Rights Act of 1964.

1.) I began working at Home Depot on April 1, 1991.
2.) My job performance has always been satisfactory.
3.) When I was hired I was told that I could always have a set schedule. I have children and have to find day care so I need a set schedule to make sure that happens. I have never had a problem with this kind of scheduling in the past.
4.) I am being treated for Depression/Anxiety by my primary care physician, Dr. Angelica Whitman.
5.) For a few years my set schedule has been 8:30 to 5:30.
6.) Approximately two weeks ago, I went to my immediate supervisor Dory Farrington (Female), to ask if I could change my schedule to 8 to 5 because I was having trouble finding suitable childcare. Ms. Farrington informed me that it would be okay. I felt that I should inform the assistant

manager in charge of my department Patricia LaFore (Female), about my schedule change. Ms. LaFore informed me that I could not change my schedule now and that we would have to discuss my having a set schedule at all anymore.

7.) After I was denied this accommodation in my schedule I became extremely anxious. I went to my doctor who requested that I be given this change in my hours so that my anxiety level remains stable.

8.) I then went to speak to the store manager Chris Catalina (Male). I informed him that I had a note from my doctor requesting an accommodation for my disability. He said that it would be okay to change my schedule and we would have a meeting about it after the July 4th holiday. He also requested that I bring the doctors note to the meeting.

9.) On Monday, July 7, 2003, Mr. Catalina informed me that I would have to do as Ms. Farrington says, with no other explanation. We never had a meeting, nor did he take my doctors note.

10.)I believe the real reason I am being denied a reasonable accommodation is based on my disability (Depression/Anxiety), and my status as a male. I believe that if a woman were seeking a change in schedule to accommodate her child care needs, this change would be granted. I believe that there are women in fact that are being accommodated in this way at this store location.

**I WANT THIS CHARGE FILED WITH THE EEOC: XXX**

**I WILL ADVISE THE AGENCIES IF I CHANGE MY ADDRESS OR TELEPHONE NUMBER AND I WILL COOPERATE FULLY WITH THEM IN THE PROCCESSING OF MY CHARGE IN ACCORDANCE WITH THEIR PROCEDURES.**

**I SWEAR OR AFFIRM THAT I HAVE READ THIS COMPLAINT AND THAT IT IS TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.**

[signature]

Steve Boutin

**SWORN TO AND SUBSCRIBED BEFORE ME THIS** 15 **DAY OF** July, **2003**

**NOTARY PUBLIC** Lynda M St Jean

**My Commission Expires:** / /

LYNDA M. ST. JEAN
Notary Public
Commonwealth of Massachusetts
My Commission Expires
February 12, 2004

Case 3:05-cv-30162-MAP Document 16-5 Filed 09/19/2006 Page 1 of 5

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**436 Dwight Street, Rm. 220, Springfield, MA 01103**
**Phone: (413) 739-2145 Fax: (413) 784-1056**

## - DISMISSAL and NOTIFICATION of RIGHTS -

| **To:** Claire L. Thompson<br>Doherty, Wallace, Pillsbury & Murphy<br>1 Monarch Place, Suite 1900<br>Springfield, MA 01144-1900 | **Case:** Boutin v. Home Depot<br>**MCAD Docket Number:** 032301869<br>**EEOC Number:** 16CA302145<br>**Investigator:** Karen Dome |
|---|---|

Your complaint has been dismissed for the following reasons:

[ ] The facts alleged fail to state a claim under any of the statutes the Commission enforces.

[ ] Respondent employs less than the required number of employees.

[ ] Your complaint was not timely filed with the Commission, i.e. you waited too long after the date(s) of the alleged discrimination to file. Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[ ] You failed to provide requested information, failed or refused to appear or to be available for necessary interviews/conference, or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your complaint. You have had more than 30 days in which to respond to our written request.

[ ] The Commission's efforts to locate you have been unsuccessful. You have had at least 30 days in which to respond to a notice sent to your last known address.

[ ] The Respondent has made a reasonable settlement, offering full relief for the harm you alleged. 30 days have expired since you received actual notice of this settlement offer.

[X] The Commission issues the following determination. Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes a violation of the statutes. This does not certify that the Respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this complaint.

[ ] Other (briefly state)

### - NOTICE of APPEAL -

If you wish to appeal the dismissal of your complaint and believe that the above stated reason for dismissal is incorrect, you may appeal to this Commission within 10 days after receipt of this notice. You or your attorney must make your appeal of the dismissal in writing to the appeals clerk of this Commission.
**Attention: Migdalia Rivera.**

All employment complaints, where applicable, were filed by the MCAD with the Equal Employment Opportunity Commission. Our finding, which will be forwarded to its area office, JFK Federal Building, Boston, MA will be given substantial weight provided that such findings are in accordance with the requirements of Title VII of the Civil Rights Act of 1964, the ADEA, and/or the ADA, as amended.

[signature] 5/13/04

Cynthia Tucker — Date
Investigating Commissioner

Cc: Colleen Hayes-Hilton
EEO Specialist
NE Store Support Center
15 Dan Road
Canton, MA 02021

Case 3:05-cv-30162-MAP Document 16-5 Filed 09/19/2006 Page 2 of 5

15 Dan Road • Canton, Massachusetts 02021
(781) 830-0434 • Fax: (781) 830-0472

April 20, 2004

Via Facsimile and Overnight Delivery Service

Ms. Karen Dome
Investigator
Massachusetts Commission Against Discrimination
436 Dwight Street
Springfield, MA 01103

Re: Steve Boutin v. Home Depot,
MCAD Docket No.: 03SEM01869, EEOC No.: 16CA302145

Dear Ms. Dome:

Home Depot denies that Mr. Boutin is entitled to an accommodation based on an alleged disability and states that Mr. Boutin's scheduling request is based on his childcare needs. Childcare issues are not a workplace barrier that the ADA is designed to address. Despite this fact, Home Depot has accommodated Mr. Boutin's request for a fixed schedule to accommodate his childcare needs. We are currently accommodating his request for a set schedule, (i.e., he is currently working a set schedule from 8:30 am to 5:30 pm Monday to Friday). However, Mr. Boutin now requests a 7:30 am to 4:30 pm schedule from Monday to Friday, which may change depending on his childcare needs. At the status hearing, Mr. Boutin produced a note from his psychiatrist that does not identify a set schedule or state that he cannot work weekends. The note from Mr. Boutin's psychiatrist states that Mr. Boutin's work schedule should accommodate the changing needs of his childcare arrangements. Employers are not required to provide an open-ended schedule as a reasonable accommodation. Although Home Depot evaluates requests for schedule changes on a case-by-case basis, Home Depot cannot guarantee that we can accommodate a hypothetical or unknown schedule request that Mr. Boutin may need in the future depending on possible changes in his childcare arrangements. Mr. Boutin is currently a full-time associate, however, if his scheduling restrictions caused by his childcare are so restrictive that he can no longer work full-time, Mr. Boutin could work part-time where he would have more flexibility.

USA
Proud Sponsor

Pursuant to the Agency's request, Home Depot is producing a list of the scheduling accommodations we are currently providing to our full-time associates at Store #2662. The scheduling accommodations listed below are based on a variety of reasons, however, unlike Mr. Boutin's scheduling requests, the requests below are not open-ended schedule requests that are subject to change from week to week or even day to day depending on circumstances outside of the workplace. Furthermore, Mr. Boutin's scheduling restrictions (unavailable nights and weekends) are far more restrictive than any of the restrictions listed below. Moreover, the fact that out of a total of 28 scheduling accommodations (including Mr. Boutin's), 17 of the accommodations have been given to Male associates negates Mr. Boutin's allegation of gender discrimination. In addition, the three known scheduling accommodations that have been granted to meet childcare needs have been given to two Males (including Mr. Boutin) and one has been given to a Female. This clearly negates Mr. Boutin's claim of gender discrimination.

List of Full-Time Associates with Scheduling Accommodations at Store #2662[1]:

1) C.B. (Female) – Unavailable on Sundays (religious accommodation)
2) C.M. (Female) – Unavailable on Tuesdays and Wednesdays after 5 p.m. (accommodation for school).
3) D.J. (Female) – Available 8 a.m. to 5 p.m. Monday though Friday and all hours on Saturdays (FMLA accommodation).
4) E.O. (Female) – Available Mondays 2 p.m. to 9 p.m., Tuesdays 12 a.m. to 9 p.m., Wednesdays 2 p.m. to 9 p.m., Thursdays 12 a.m. to 9 p.m., Fridays 2 p.m. to 9 p.m., Saturdays 7:30 a.m. to 9 p.m., and Sundays 9:30 a.m. to 3 p.m. (medical accommodation and transportation accommodation).
5) K.Z. (Female) – Unavailable on Sundays (religious accommodation).
6) C.L. (Female) – Unavailable before 2 p.m. Monday through Friday. Full availability on Saturdays and Sundays (accommodation for school).
7) L.N. (Female) – Unavailable after 5 p.m. on Tuesdays and unavailable on Sundays (religious accommodation).
8) G.M. (Female) – Unavailable after 3 p.m. on Tuesdays and Wednesday, unavailable before 11 a.m. on Thursdays.
9) K.H. (Female) – Unavailable before 8 a.m. on Wednesdays.
10) B.A. (Female) – Available Mondays 8 a.m. to 8 p.m., Tuesdays 8 a.m. to 5 p.m., Wednesdays 8 a.m. to 8 p.m., Thursdays 8 a.m. to 5 p.m., Fridays 6 a.m. to 3 p.m., Saturdays 6 a.m. to 8 p.m., Sundays open availability (childcare accommodation)
11) J.B. (Female) – Unavailable after 5 p.m. on Mondays and Wednesdays (accommodation for school).
12) R.U. (Male) - Unavailable after 6 p.m. on Mondays.
13) T.B. (Male) - Unavailable after 5 p.m. on Mondays (temporary restriction). Unavailable on Wednesdays.

[1] This list does not include associates with position-based fixed shifts. For example, Inventory Management Associates ("IMAs") work a fixed shift schedule of 4 a.m. to 1 p.m. Fixed-shift positions include: IMAs, Freight Team Associates, Pro-sales Associates (or positions dedicated to Pro-Sales), Receiving Associates, Power Equipment/John Deere Specialists (seasonal), Expediters/Installed Sales Associates, "Homers" (Professionals in certain departments such as Millwork, Floor and Wall, Hardware), "Measurers" in Kitchen and Bath, and Cross Merchandisers.

14) B.P. (Male) – Unavailable on Saturdays (childcare accommodation)
15) R.S.. (Male) – Unavailable after 7 p.m. on Fridays.
16) D.L. (Male) – Unavailable on Thursdays after 5:30 p.m.
17) G.R. (Male) – Unavailable on Thursdays after 5 p.m. (medical accommodation)
18) M.M. (Male) – Unavailable after 9 p.m. Monday through Friday, unavailable after 3 p.m. on Saturdays and 8 p.m. on Sundays .
19) M.A. (Male) – Unavailable after 6 p.m. on Mondays and Tuesdays.
20) B.R. (Male) – Unavailable after 4 p.m. on Tuesdays and Thursdays (accommodation for school).
21) S.L. (Male) – Unavailable after 5 p.m. on Mondays and Wednesdays (accommodation for school).
22) P.N. (Male) – Unavailable after 6 p.m. on Thursdays and unavailable on Sundays (religious accommodation).
23) D.S. (Male) – Unavailable on Tuesdays and Fridays.
24) S.K. (Male) – Unavailable on Sundays (religious accommodation)
25) E.L. (Male) – Unavailable on Mondays and Fridays, unavailable before 10:30 a.m. on Wednesdays and Thursdays (accommodation for school).
26) D.D. (Male) – Unavailable after 5 p.m. on Wednesdays, unavailable before 12:30 p.m. on Sundays.
27) J.S. (Male) – Unavailable after 6 p.m. on Fridays.

If you have any questions, please do not hesitate to call me at 781-830-4406.

Sincerely,

Colleen Hayes-Hilton
EEO Specialist

cc: Claire L. Thompson, Complainant's Counsel

# MEMORANDUM

CASE NAME: Boutin v. Home Depot.
DOCKET NO: 032301869
EEOC NO: 16CA302145
NUMBER OF EMPLOYEES: 25+
INVESTIGATOR: Karen Dome

**RE: RECOMMENDATION FOR DISMISSAL OF COMPLAINT**
**DATE: May 13, 2004**

## ISSUE(S) INVESTIGATED:

On July 16, 2003, Complainant filed a charge alleging that Respondent discriminated against him by denying him a reasonable accommodation, by subjecting him to unequal terms and conditions of employment on the basis of his sex (male) and disability (Depression/Anxiety). Complainant alleged that Respondent's conduct was in violation of M.G.L. Chapter 151B, §4(1,16), Title VII of the Civil Rights Act of 1964, as amended, and The Americans with Disabilities Act.

## SUMMARY OF FINDINGS:

Respondent denies all allegations. The evidence presented supported Respondent's position that Complainant was not denied a reasonable accommodation and was not subjected to unequal terms and conditions of employment on the basis of his sex and disability. The evidence presented supported Respondent's legitimate non-discriminatory reason that Complainant was not granted a schedule change, because his request did not fit the needs of business. Complainant has failed to produce sufficient evidence of pretext. Therefore, there is insufficient evidence upon which a fact-finder could form a reasonable belief that the Respondent committed an unlawful practice.

Kelley Petty
Investigative Intern

Karen Dome
Investigator

Migdalia Rivera
Supervisor

Case 3:05-cv-30162-MAP Document 16-6 Filed 09/19/2006 Page 1 of 8

# In The United States District Court
# For The Western District of Massachusetts

| | |
|---|---|
| **Steve Boutin,** **PLAINTIFF** | **CIVIL ACTION NO.:** American Disabilities Act; Discrimination Under Title VII, Civil Rights Act of 1964; Hostile Work Environment; Retaliation, Punitive Damages; Trial by Jury |
| **v.** | |
| **HOME DEPOT U.S.A., INC.,** **DEFENDANT** | |

## COMPLAINT

TO THE HONORABLE COURT:

COMES NOW PLAINTIFF, through the undersigned attorney and respectfully allege and prays:

1. This is an action for compensatory and punitive damages for Defendant's violation of Plaintiff's federally protected rights under the Laws of the United States and the Laws of the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

2. Jurisdiction of this action is founded upon Section 107 (A) of the American Disabilities Act (hereinafter "ADA"), 42 U.S.C. 12101, et seq. which incorporates by reference Section 706 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-5, as amended.

3. Venue of this action is proper under 28 USC Sec. 1391 (b). Supplemental jurisdiction (28 USC Sec. 1367) is invoked for the claims arising under the

violation of following Massachusetts Laws; M.G.L. 151B, §4(1), M.G.L. c. 151B § 4(4)). M.G.L. c. 93, ' 102 (equal rights act), sex discrimination in violation M.G.L. c. 15 1 B, ' 4(4), and retaliation in violation of ' 4(4A) for exercising his rights under that provision.

4. All conditions precedent to jurisdiction under Section 706 of Title VII, 42 USC Section 2000e-5(f)(3) have occurred or been complied with:
   a. A charge of employment discrimination on the basis of disability discrimination was timely filed with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the commission of the unlawful employment practices alleged herein.
   b. A Notice of Right to Sue was sent by the EEOC, dated April 6, 2005. The Notice was received by Plaintiff on or about April 8, 2005.
   c. This Complaint has been filed within 90 days of receipt of the EEOC's Notice of Right to Sue.

**PARTIES**

5. Plaintiff Steve Boutin (hereinafter Boutin or Plaintiff) is an adult and a resident of Chicopee, Massachusetts and a citizen of the United States.
6. Defendant, Home Depot U.S.A., Inc. (hereinafter "Home Depot" or "Defendant") is upon information and belief a corporation and/or legal entity organized under the Laws of the Commonwealth of Massachusetts.

7. Defendant is corporation and/or legal entity subject to the laws of the United States and of the Commonwealth of Massachusetts, including American with Disabilities Act, 42 USC 12101-13, et seq.

8. Defendant is an "employer" within the meaning of 42 USC 12111, employing 15 or more employees for each working day, in each of 20 or more calendar weeks in the current and preceding calendar year, and engaged in an industry affecting commerce.

9. Defendant is a "person" within the meaning of Section 107 (7) of the ADA, 42 USC Section 12111 (7), and Section 701 of the Title VII of the Civil Rights Act of 1964, 42 USC Sec. 2000e.

10. Defendant is engaged in an industry that affects commerce within the meaning of Section 101 (7) of the ADA, 42 USC Sec. 12111 (7), and Section 701 of the Civil Rights Act of 1964, 42 USC Sec. 2000e.

## FACTS

11. Plaintiff is a full-time single parent with full custody.

12. Plaintiff suffers from depression and anxiety for which he is being treated by Dr. Schuyler Whitman.

13. Plaintiff was hired as a Receiving Associate at Store #2662 in West Springfield, Massachusetts on or about April 1, 1991.

14. Upon hire, Plaintiff was assured by Defendant that Plaintiff would always have a schedule that would accommodate his child care needs.

15. Mr. Boutin worked in several different departments and positions throughout his employment with Defendant.

16. Plaintiff's job performance has always been satisfactory.

17. On several occasions during the year 2003, Plaintiff approached his department manager, Patricia LeFore, to request a change in his schedule to accommodate his child-care issues.

18. Mr. Boutin explained to Ms. LaFore (female) and later to store manager, Chris Catalina (female), that he needed to adjust his hours to permit him to care for his 11-year old daughter after school.

19. Plaintiff further explained and formally informed Defendant that Plaintiff is disabled due to depression and anxiety which is exacerbated by Home Depot's schedule restrictions and his inability to care for his daughter after school.

20. Plaintiff had previously submitted a recommendation from his treating physician, Dr. Whitman, dated June 25, 2003, confirming his ongoing treatment for depression and anxiety and his need for schedule change.

21. Plaintiff's treating physician, Dr. Whitman, explained that, without the accommodation sought by Plaintiff, his anxiety and depression would be further exacerbated.

22. Rather than accommodate Plaintiff's request for a specific schedule, Ms. LaFore summarily denied the request and threatened to place Plaintiff on a rotating schedule with no set hours.

23. Ms. LaFore's conduct merely served to exacerbate Mr. Boutin's ongoing depression and anxiety.

24. **Ms. LaFore intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of her conduct.**

25. On or about July 15, 2003, Plaintiff filed a charge with the Commission Against Discrimination for disability and gender discrimination.

26. At the time of Plaintiff's request for a work schedule change, Defendant had been informed of Plaintiff's disability within the meaning of Section 107 (7) of the ADA, 42 USC Section 12111 (7).

27. Plaintiff's immediate supervisor, Dory Farrington, granted Plaintiff's schedule change.

28. Plaintiff then informed the department manager, Patricia LeFore, that Farrington granted his request for a schedule change.

29. Ms. LeFore, later informed Plaintiff that his request for a schedule change will be denied.

30. Upon the news that that Plaintiff's request for a schedule change was denied, his medical condition became exasperated.

31. Plaintiff is under the care of a doctor for his disability. Upon Plaintiff's visit with his doctor, the doctor suggested that he change his working hours in order to help stabilize his anxiety levels

32. Plaintiff was subjected to discrimination because of his disability (Depression and Anxiety disorder) and gender (male)." Plaintiff was subjected to illegal discrimination, specifically, denied scheduling accommodations for childcare issues, while female associates are accommodated.

33. Plaintiff was denied reasonable accommodation despite his disability (Depression and Anxiety disorder).

**FIRST CAUSE OF ACTION**
Violation of American with Disabilities Act)

34. Plaintiff repeats and re-alleges each and every preceding allegation as if fully set herein.

35. Boutin is, and was, at the time of his claim of discrimination an individual with a "disability" within the meaning of Section 3 (2) of the American with Disabilities Act, 42 USC Sec. 12102 (2), since he has been retaliated against for asserting his constitutional rights.

36. Boutin is a "qualified individual with a disability" as that term is defined in section 101(8) of the ADA. More specifically, Boutin is an individual with a disability who could perform the essential function of his job at the time he employment discrimination claim.

37. As a direct and proximate result of the violations of Boutin's rights by Defendant, he has suffered and continues to suffer depression, and other substantial damages such as physical and emotional pain, distress, and mental anguish, humiliation and other non-pecuniary losses.

**SECOND CAUSE OF ACTION**
(Unlawful Retaliation in violation of G.L. c. 151B § 4(4))

38. Defendant retaliated against Plaintiff by verbally harassing Plaintiff.

39. Defendant retaliated against Plaintiff for having engaged in protected activity

when he reasonably and in good faith believed that he was discriminated against and acted reasonably in response to that belief by filing a claim of discrimination with the Massachusetts Commission Against Discrimination (MCAD) Commission because of his sex (male) and "Disability" as that term is defined in section 101(8) of the ADA.

40. These adverse actions occurred within a time period reasonably close to the protected activity such that retaliation can be inferred.

41. Plaintiff repeats and re-alleges each and every preceding allegation as if fully set herein..

42. Plaintiff has suffered mental anguishes and economical hardships as a consequence of Defendants unlawful harassment.

Plaintiff requests the judgment of this Court against Defendants as follows.

a. Grant Plaintiff the right to a jury trial.

b. Find and hold that Plaintiff suffered from Defendants' acts of discrimination on the basis of gender and disability as that term is defined in section 101(8) of the ADA .

c. Award Plaintiff compensatory damages under ADA for the acts of discrimination as well as for the depression, physical and emotional pain, distress, mental anguish, humiliation and other non-pecuniary losses.

d. Award Plaintiff punitive Damages under ADA.

e. Order the Defendant to pay Plaintiff compensatory damages for depression, physical and emotional pain, distress, mental anguish, loss of

Case 3:05-cv-30162-MAP Document 16-6 Filed 09/19/2006 Page 8 of 8

enjoyment of life, humiliation and other nonpecuniary losses, due to Defendants discriminatory acts.

WHEREFORE, it is respectfully requested from this Honorable Court to consider and grant this Complaint, awarding Plaintiff the aforementioned relief, plus prejudgment and post-judgment interest, all legal costs and attorney fees. Such further relief as the Court may deem just and proper.

**PLAINTIFF REQUEST A JURY TRIAL**

**DATE: JULY 7, 2005**

Respectfully submitted,

**STEVE BOUTIN**
**BY HIS ATTORNEY**

**Tammy Sharif, Esq.**
**BBO# 659134**
**The Historical Walker Building**
**1242 Main Street, Suite 314**
**Springfield, MA 01103**
413-439-0200

Case 3:05-cv-30162-MAP Document 16-7 Filed 09/19/2006 Page 1 of 10

FILED
IN CLERK'S OFFICE
2005 OCT 25 A 10:47
U.S. DISTRICT COURT
DISTRICT OF MASS.

In The United States District Court
For The Western District of Massachusetts

**Steve Boutin,**
**PLAINTIFF**

**v.**

**HOME DEPOT U.S.A., INC.,**
**DEFENDANT**

**CIVIL ACTION NO.**
American Disabilities Act; Discrimination Under Title VII, Civil Rights Act of 1964; Hostile Work Environment; Retaliation, Punitive Damages; Trial by Jury

**AMENDED COMPLAINT**

TO THE HONORABLE COURT:

Pursuant to Federal Rule of Civil Procedure 15(a), the plaintiff hereby amends his Complaint as a matter of course, prior to the service of a responsive pleading, as to read follows:

1. This is an action for compensatory and punitive damages for Defendant's violation of Plaintiff's federally protected rights under the Laws of the United States and the Laws of the Commonwealth of Massachusetts.

**JURISDICTION AND VENUE**

2. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331, 1343 (3) & (4) and 42 U.S.C. §§1983 and 1988 as this case arises under the equal protection clause of the Fourteenth Amendment to the United States Constitution. As plaintiffs' state law claims derive from the same nucleus of operative facts as his federal claims, this Court has pendent jurisdiction pursuant to 28 U.S.C. sec. 1367.

3. At all times relevant hereto, Defendant Home Depot, Inc., a corporation licensed and doing business in Massachusetts, is and at all times mentioned herein was an employer within the meaning of the Americans with Disabilities Act (ADA) and the Family Medical Leave Act (FMLA).
4. This Court has jurisdiction over this matter as this matter involves a federal question based upon the Americans With Disabilities Act of 1990 and the Family Medical Leave Act.
5. Jurisdiction of this action is founded upon Section 107 (A) of the American Disabilities Act (hereinafter "ADA"), 42 U.S.C. 12101, et seq. which incorporates by reference Section 706 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-5, as amended.
6. Venue of this action is proper under 28 USC Sec. 1391 (b). Supplemental jurisdiction (28 USC Sec. 1367) is invoked for the claims arising under the violation of following Massachusetts Laws; M.G.L. 151B, §4(1), M.G.L. c. 151B § 4(4)). M.G.L. c. 93, ' 102 (equal rights act), sex discrimination in violation M.G.L. c. 15 1 B, ' 4(4), and retaliation in violation of ' 4(4A) for exercising his rights under that provision.
7. All conditions precedent to jurisdiction under Section 706 of Title VII, 42 USC Section 2000e-5(f)(3) have occurred or been complied with:
   a. A charge of employment discrimination on the basis of disability discrimination was timely filed with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the commission of the unlawful employment practices alleged herein.
   b. A Notice of Right to Sue was sent by the EEOC, dated April 6, 2005. The Notice was received by Plaintiff on or about April 8, 2005.

Case 3:05-cv-30162-MAP Document 16-7 Filed 09/19/2006 Page 3 of 10

c. This Complaint has been filed within 90 days of receipt of the EEOC's Notice of Right to Sue.

**PARTIES**

8. At all times relevant hereto, Plaintiff, Steve Boutin (hereinafter Boutin or Plaintiff) is an adult, has resided in Chicopee, Massachusetts and is a citizen of the United States.

9. Defendant, Home Depot U.S.A., Inc. (hereinafter "Home Depot" or "Defendant") is upon information and belief a corporation and/or legal entity organized under the Laws of the Commonwealth of Massachusetts.

10. Defendant is corporation and/or legal entity subject to the laws of the United States and of the Commonwealth of Massachusetts, including American with Disabilities Act, 42 USC 12101-13, et seq.

11. Defendant is an "employer" within the meaning of 42 USC 12111, employing 15 or more employees for each working day, in each of 20 or more calendar weeks in the current and preceding calendar year, and engaged in an industry affecting commerce.

12. Defendant is a "person" within the meaning of Section 107 (7) of the ADA, 42 USC Section 12111 (7), and Section 701 of the Title VII of the Civil Rights Act of 1964, 42 USC Sec. 2000e.

13. Defendant is engaged in an industry that affects commerce within the meaning of Section 101 (7) of the ADA, 42 USC Sec. 12111 (7), and Section 701 of the Civil Rights Act of 1964, 42 USC Sec. 2000e.

**FACTS**

14. Plaintiff is a full-time single parent with full custody.

15. Plaintiff suffers from depression and anxiety for which he is being treated by Dr. Schuyler Whitman.

16. Plaintiff was hired as a Receiving Associate at Store #2662 in West Springfield, Massachusetts on or about April 1, 1991.

17. Upon hire, Plaintiff was assured by Defendant that Plaintiff would always have a schedule that would accommodate his child care needs.

18. Mr. Boutin worked in several different departments and positions throughout his employment with Defendant.

19. Plaintiff's job performance has always been satisfactory.

20. On several occasions during the year 2003, Plaintiff approached his department manager, Patricia LeFore, to request a change in his schedule to accommodate his child-care issues.

21. Mr. Boutin explained to Ms. LaFore (female) and later to store manager, Chris Catalina (male), that he needed to adjust his hours to permit him to care for his 11-year old daughter after school.

22. Plaintiff further explained and formally informed Defendant that Plaintiff is disabled due to depression and anxiety which is exacerbated by Home Depot's schedule restrictions and his inability to care for his daughter after school.

23. Plaintiff had previously submitted a recommendation from his treating physician, Dr. Whitman, dated June 25, 2003, confirming his ongoing treatment for depression and anxiety and his need for schedule change.

24. Plaintiff's treating physician, Dr. Whitman, explained that, without the accommodation sought by Plaintiff, his anxiety and depression would be further exacerbated.

25. Rather than accommodate Plaintiff's request for a specific schedule, Ms. LaFore summarily denied the request and threatened to place Plaintiff on a rotating schedule with no set hours.

26. Plaintiff at all times met all legitimate job expectations of Defendant employer.

27. Ms. LaFore's conduct merely served to exacerbate Mr. Boutin's ongoing depression and anxiety.

28. Ms. LaFore intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of her conduct.

29. On or about July 15, 2003, Plaintiff filed a charge with the Commission Against Discrimination for disability and gender discrimination.

30. At the time of Plaintiff's request for a work schedule change, Defendant had been informed of Plaintiff's disability within the meaning of Section 107 (7) of the ADA, 42 USC Section 12111 (7).

31. Plaintiff's immediate supervisor, Dory Farrington, granted Plaintiff's schedule change.

32. Plaintiff then informed the department manager, Patricia LeFore, that Farrington granted his request for a schedule change.

33. Ms. LeFore, later informed Plaintiff that his request for a schedule change will be denied.

34. Upon the news that that Plaintiff's request for a schedule change was denied, his medical condition became exasperated.

35. Plaintiff is under the care of a doctor for his disability. Upon Plaintiff's visit with his doctor, the doctor suggested that he change his working hours in order to help stabilize his anxiety levels

36. Plaintiff was subjected to discrimination because of his disability (Depression and Anxiety disorder) and gender (male)." Plaintiff was subjected to illegal discrimination, specifically, denied scheduling accommodations for childcare issues, while female associates are accommodated.
37. Plaintiff was denied reasonable accommodation despite his disability (Depression and Anxiety disorder).

**FIRST CAUSE OF ACTION**
(Violation of American with Disabilities Act)

38. Plaintiff repeats and re-alleges each and every preceding allegation as if fully set herein.
39. Boutin is, and was, at the time of his claim of discrimination an individual with a "disability" within the meaning of Section 3 (2) of the American with Disabilities Act, 42 USC Sec. 12102 (2), since he has been retaliated against for asserting his constitutional rights.
40. Boutin is a "qualified individual with a disability" as that term is defined in section 101(8) of the ADA. More specifically, Boutin is an individual with a disability who could perform the essential function of his job at the time he employment discrimination claim.
41. As a direct and proximate result of the violations of Boutin's rights by Defendant, he has suffered and continues to suffer depression, and other substantial damages such as physical and emotional pain, distress, and mental anguish, humiliation and other non-pecuniary losses.

**SECOND CAUSE OF ACTION**
(Unlawful Retaliation in violation of G.L. c. 151B § 4(4))

42. Plaintiff repeats and re-alleges each and every preceding allegation as if fully set herein.

43. Defendant retaliated against Plaintiff by verbally harassing Plaintiff.

44. Defendant retaliated against Plaintiff for having engaged in protected activity when he reasonably and in good faith believed that he was discriminated against and acted reasonably in response to that belief by filing a claim of discrimination with the Massachusetts Commission Against Discrimination (MCAD) Commission because of his sex (male) and "Disability" as that term is defined in section 101(8) of the ADA.

45. Plaintiff has suffered mental anguishes and economical hardships as a consequence of Defendants unlawful harassment.

**THIRD CAUSE OF ACTION**
(Negligent or Intentional Infliction of Emotional Distress)

46. Plaintiff repeats and re-alleges each and every preceding allegation as if fully set herein.

47. Defendants' actions described herein were intentional and inflicted upon Plaintiff severe mental and emotional distress.

48. As a result of Defendants' actions, Plaintiff has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal 1

**FOURTH CAUSE OF ACTION**
(Gender Discrimination in Violation of M.G.L. c. 151B)

49. Plaintiff repeats and re-alleges each and every preceding allegation as if fully set herein.

50. Plaintiff was a male and fully qualified for his position at all relevant times.

51. During his employment with Defendant, Plaintiff is treated differently than similarly situated female employees.

52. Numerous female employees of Defendant employer have been afforded the exact same accommodations sought by Plaintiff.

53. During his employment with Defendant, Plaintiff was harassed because of his gender.

54. By discriminating against plaintiff in the terms and conditions of his employment, defendants have subjected plaintiff to sex discrimination in violation of the Fourteenth Amendment.

55. Defendant's intentional, willful, and malicious conduct and wanton and reckless disregard of Plaintiff's rights proximately caused Plaintiff to suffer damages and Plaintiff is entitled to judgment and damages in an amount to be proven at trial.

**PLAINTIFF REQUEST A JURY TRIAL**

Plaintiff requests the judgment of this Court against Defendants as follows.

a. Grant Plaintiff the right to a jury trial.

b. Find and hold that Plaintiff suffered from Defendants' acts of discrimination on the basis of gender and disability as that term is defined in section 101(8) of the ADA.

c. Award Plaintiff compensatory damages under ADA for the acts of discrimination as well as for the depression, physical and emotional pain, distress, mental anguish, humiliation and other non-pecuniary losses.

d. Award Plaintiff punitive Damages under ADA.

   e. Order the Defendant to pay Plaintiff compensatory damages for depression,

      physical and emotional pain, distress, mental anguish, loss of enjoyment of life,

      humiliation and other nonpecuniary losses, due to Defendants discriminatory acts.

WHEREFORE, it is respectfully requested from this Honorable Court to consider and grant this

Complaint, awarding Plaintiff the aforementioned relief, plus prejudgment and post-judgment

interest, all legal costs and attorney fees. Such further relief as the Court may deem just and

proper.


**PLAINTIFF REQUEST A JURY TRIAL**

**DATE: OCTOBER 20, 2005**

                              Respectfully submitted,

                              **STEVE BOUTIN**
                              **BY HIS ATTORNEY**


                              **Tammy Sharif, Esq.**
                              **BBO# 659134**
                              **The Historical Walker Building**
                              **1242 Main Street, Suite 314**
                              **Springfield, MA 01103**

                              413-439-0200

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true copy of the within Plaintiff's Amended Complaint was this day served upon all parties to this action by summons.

SIGNED under the pains and penalties of perjury.

Dated: October 20, 2005

Respectfully submitted,
Steve Boutin
By his Attorney,

Tammy Sharif, Esq., BBO# 659134
The Walker Building
1242 Main Street, Suite 314
Springfield, MA 01103
Ph. (413)439-0200 / FAX 413-785-0801

ServiceNet

Integrated Human Services

May 13, 2002

To Home Depot
W.Springfield, Ma

To Whom it may concern,

Mr Boutin is a client of mine who is being treated at this clinic for depression and anxiety. He is also trying to raise his 9 year old daughter as well. I feel that changing Mr Boutin's schedule to include evenings and nights would be very detrimental to his mental status, and could cause a setback in his treatment. I recommend Mr Boutin stay on his current schedule for the foreseeable future.

Please call if you have further questions.

Sincerely,

Schuyler Whitman MD

Schuyler Whitman M.D.

EXHIBIT
Boutin
Ex. 4 5/17/06
LMD

129 King Street • Northampton, MA 01060 • 413.585.1300 • Fax 413.582.4253 • www.servicenetinc.org Susan L. Stubbs, C.E.O.

EXHIBIT
Boutin
Ex. 5 5/17/06
LMD

ServiceNet

Integrated Human Services

June 25, 2003

To Whom It May Concern:

Steve Boutin is a patient I have been treating for depression and anxiety. He is currently prescribed two different medications. He is a single parent.

I feel that changing his schedule would impair his ability to cope. I recommend that he remain on his current schedule for the foreseeable future.

Sincerely,

Schuyler Whitman

SCHUYLER WHITMAN

129 King Street • Northampton, MA 01060 • 413.585.1300 • Fax 413.582.4252 • www.servicenetinc.org • Susan L. Stubbs, C.E.O

SERVICENET MED CLINIC

Steve Boutin
3/1/04

Client # 19407
(22)

S. Whitman, MD
Patient was seen for 30 min.

Data: This is a 46-year old white male who comes today for medication follow-up.

He says that he is doing okay. He does find that when he gets home from work it seems as if the Wellbutrin has worn off. He wonders about trying the next extended release form. He also finds that he is often needing two of the Valium to sleep now. He adds that he has gotten engaged and will be getting married next year.

Objective: He is casually dressed and neatly groomed. He is pleasant and cooperative. Mood is generally okay, somewhat down in the afternoons. There is no evidence of psychotic thinking or hallucinations. There is no suicidal ideation. He is having more trouble sleeping.

Diagnosis:

| | |
|---|---|
| AXIS I: | Depressive Disorder, NOS, with features of anxiety (311).<br>ADHD. |
| AXIS II: | No diagnosis. |
| AXIS III: | Environmental Allergies. |

Assessment: We discussed the extended release form. It is available in 150 mg and 300 mg and although he had urinary side effects (frequency) on a higher dose of the SR, he would like to try the 300 mg of the XL. I also discussed the Valium with him. I would prefer that he not go above 10 mg and certainly not use 2 pills if he doesn't need it as he will probably develop a tolerance. In addition, I discussed with him that I will be transferring to Northampton and that Dr. White will be taking over in Chicopee. He is agreeable to a transfer.

Plan:

1. Trial of Wellbutrin-XL 300 mg 1 tablet in the morning, #30 x 3 refills.
2. Valium 5 mg 1-2 hs #60 x 3 refills.

He will be seen for follow-up by Dr. White on Monday, May 24, 2004 at 1 p.m. in Chicopee.

Schuyler Whitman, M.D.

SW/pmt

**SERVICENET MED CLINIC**

Steve Boutin | #19407 (22) | Schuyler Whitman, M.D.

11/17/03 | The patient was seen for 15 minutes.

Data: This is a 47 year old white male who comes in today for medication follow up.

He says he has been doing well. He is hoping to transfer to a different work site. He feels that the medication is helping him. He is not feeling overly tired.

Objective: He is casually dressed, neatly groomed. He is pleasant and cooperative. Mood and affect are euthymic. There is no evidence of psychotic thinking or hallucinations. There is no suicidal ideation.

Diagnosis:

AXIS I: Depressive Disorder NOS with features of anxiety (311).
ADHD.
AXIS II: No diagnosis.
AXIS III: Environmental allergies.

Assessment: Stable.

Plan: Continue current medications:

1. Wellbutrin SR 200 mg 1 tablet in the morning, #30 with 3 refills.
2. Valium 5 mg 1 tablet hs, PRN, #30 with 3 refills.

He will be seen for follow up on Monday, March 1, 2004 at 1:00 p.m. in Chicopee.

Schuyler Whitman, M.D./mcm

**SERVICENET MED CLINIC**

Steve Boutin #19407 (22) Schuyler Whitman, M.D.

8/4/03 The patient was seen for 25 minutes.

Data: This is a 47 year old white male who comes in today for medication follow up.

At his last visit he was started on a trial of Valium at bedtime as he thought he had been on it in the past and that it had been very helpful to help him unwind at night and sleep and be less anxious during the day.

Today he says it is very helpful. He is able to sleep well on 5 mg and feels more relaxed during the day. He tried taking 2 5 mg tablets but found that he felt headachy and as if he had a hangover so he went back to one.

Objective: He is casually dressed, neatly groomed. He is pleasant and cooperative. His mood and affect are euthymic. There is no evidence of psychotic thinking or hallucinations. There is no suicidal ideation.

Diagnosis:

| | |
|---|---|
| AXIS I: | Depressive Disorder NOS with features of anxiety (311). ADHD. |
| AXIS II: | No diagnosis. |
| AXIS III: | Celiac disease, environmental allergies. |

Assessment: Doing well. We again reviewed risks and benefits of Valium and that when used consistently it may accumulate so that if he finds himself feeling somewhat depressed or tired he should consider that it might be the Valium and he might need to go off it. Also he may develop a tolerance to it if he continues with it daily.

Plan: Continue current medications:

1. Wellbutrin SR 200 mg 1 tablet in the morning, #30 with 3 refills.
2. Valium 5 mg 1 tablet hs PRN, #30 with 3 refills.

He will be seen for follow up on Monday, November 17, 2003 at 1:30 p.m. in Chicopee.

Schuyler Whitman, M.D./mcm

**SERVICENET MED CLINIC**

BOUTIN, Steve — 19407 — S. Whitman, M.D.
5/12/03 — (22) — Patient seen for 30 mins.

Data: This is a 47-year old, white male who comes in today for medication follow-up.

At his last visit, he was started on a trial of Strattera. However he says he took it for one day and felt chilled and sweaty and did not want to continue it any longer. He went back on the Wellbutrin 200 mg in the morning and the Wellbutrin helps to "take the edge off". He does not want to try the Strattera again even at a lower dose.

He says since all of the medications we have tried, except for the Wellbutrin, have not been helpful, he wonders about trying something completely different. He said one time he was given some kind of a sedative before medical procedure and it helped him to sleep and helped him to feel better for days. He didn't feel anxious. He wasn't tripping over his own words and he felt relaxed. He's not sure what it was.

Objective: He's casually dressed, neatly groomed. He's pleasant and cooperative. Mood and affect are mildly anxious with no evidence of psychotic thinking or hallucinations. There is no suicidal ideation. He denies any history of alcohol or substance abuse.

**AXIS I:** 1. Depressive Disorder, NOS with Features of Anxiety (311).
2. ADHD.
**AXIS II:** No diagnosis
**AXIS III:** Celiac disease; environmental allergies.

Assessment: I discussed with him that probably what he received was a benzodiazepine such as Valium, Klonopin, or Ativan. I discussed risks and benefits of these medications including that they should not be used with alcohol, that on the long-term they may possibly affect memory and be habit-forming. However on review he appears to have done so much better as he describes it, that I think it is worth a trial as long as he is aware of the risks. We discussed alternatives. I will give him Valium to take at h.s. which should last through the next day and he may not need to take every day.

Plan:

1. Continue Wellbutrin, which he has resumed. Wellbutrin SR 200 mg one tab in the AM, #30, x3).
2. Trial of Valium 5 mg, one to two tabs, h.s. prn, #60, x3.

He will be seen again on Monday, 8/4/03 at 1:00 p.m. in Chicopee.

Schuyler Whitman, M.D./mlj

**SERVICENET MED CLINIC**

Steve Boutin #19407 (22) Schuyler Whitman, M.D.

2/25/03 The patient was seen for 20 minutes.

Data: This is a 46 year old white male who comes in today for medication follow up.

He continues on the Wellbutrin and is doing okay but because of sexual side effects wants to know if there is something else that would be helpful. He says he tried the Remeron but it made him feel so awful that he couldn't even go to work one day. He went off it after three or four days.

Objective: He is casually dressed and neatly groomed. He is pleasant and cooperative. His mood and affect are euthymic. There is no evidence of psychotic thinking or hallucinations. There is no suicidal ideation.

Diagnosis:

| | |
|---|---|
| AXIS I: | Depressive Disorder NOS with features of anxiety (311).<br>ADHD. |
| AXIS II: | No diagnosis. |
| AXIS III: | Celiac disease; environmental allergies. |

We discussed Strattera. I advised him that it is a new medication and so I don't have experience with it. Nevertheless it is indicated for ADHD. It is not known to have sexual side effects. Risks, benefits and side effects were discussed. He would like to try it.

Plan: Trial of Strattera. I recommend that he discontinue Wellbutrin. The following prescription was called in:

1. Strattera 40 mg 1 tablet for 3 days, then increase to 2 tablets daily, #60 with 1 refill.

This was called into the Stop & Shop pharmacy in Chicopee (593-3999). He was also given a prescription for:

2. Strattera 40 mg 2 tablets daily, #60 with no refills for when those prescriptions run out.

He will be seen again on Monday, May 12, 2003 at 1:00 p.m. He should call the clinic in the meantime if there are any questions or problems.

SWM

Schuyler Whitman, M.D./mcm

Add: 2/26/03
Tel to pt. to discuss that there are some reported sexual side effects with Strattera in clinical trials. Pt. not home - [illegible] SWMD

**SERVICENET MED CLINIC**

Steve Bourtin #19407 (22) Schuyler Whitman, M.D.

12/10/02 The patient was seen for 20 minutes.

Data: This is a 46 year old white male who comes in today for medication follow up.

He says that on the increased Wellbutrin he still had sexual side effects. He lowered it to once a day and he is having much fewer sexual side effects. He is not depressed. He is not anxious but he still has some trouble focusing. He wants to discuss trying something else in addition to the Wellbutrin that doesn't have sexual side effects.

Objective: He is casually dressed and neatly groomed. He is pleasant and cooperative. His mood and affect are euthymic. There is no evidence of psychotic thinking or hallucinations. There is no suicidal ideation. He has some trouble sleeping. His appetite is okay. He describes some continuing problems with focusing and memory and wants to try another antidepressant to boost the effects of Wellbutrin, which he cannot tolerate the higher dose.

Diagnosis:

AXIS I: Depressive Disorder NOS with features of anxiety (311).
ADHD.
AXIS II: No diagnosis.
AXIS III: Celiac Disease; environmental allergies.

Having sexual side effects on 400 mg of Wellbutrin. He went back down to 200 mg a day requesting augmentation.

I had already given him a trial of Serzone, which he could not tolerate. I discussed Remeron with him, which should not have sexual side effects and also can help with sleep and may be complimentary to the Wellbutrin. He would like to try it. As he recalls he was on it sometime in the distant past but he cannot recall how he felt on it and we do not have records about it but he is not aware of any major problem on it.

Plan: Decrease Wellbutrin SR 200 mg 1 tablet in the morning, #30 with 2 refills. Trial of Remeron 15 mg 1 tablet hs, #30 with 2 refills. He will be seen again on February 25, 2003 at 1:00 p.m. in Chicopee. He will contact the clinic in the meantime if there are any questions or problems.

next appointment
2/25/03 @ 1

Schuyler Whitman, M.D./mcm

SERVICENET MED CLINIC

Steven Boutin 19407 Schuyler Whitman, M.D.
Work type 22.

9/25/02 This patient was seen for 20 minutes.

Data: This is a 46 year old white male who comes today for medication follow up.

At his last visit he was started on a trial of Serzone. He says he took it for about three weeks but it made him feel the way he felt before he felt before he started on the Wellbutrin and he decided to go off it. He continued on the Wellbutrin 200 mg in the morning and tried taking a second dose at noon and he has not had the side effect of urinary frequency that he had before. He does feel that the Wellbutrin really helps. He is calmer. He is able to think and speak much more clearly.

Objective: He is casually dressed and neatly groomed. He is pleasant and cooperative. Mood and affect are euthymic. There is no evidence of psychotic thinking or hallucinations. There is no suicidal ideation. He is sleeping okay. Appetite is good. There is no more urinary frequency.

He requests a prescription for Allegra because he tried a friend's Allegra and it helped him with his allergies.

Diagnosis:

AXIS I: Depressive disorder NOS with features of anxiety (311).
ADHD.
AXIS II: No diagnosis.
AXIS III: Celiac disease; environmental allergies.

Assessment: Could not tolerate the Serzone. Doing well on Wellbutrin 400 mg a day. I recommend he continue that. I advised him that he should see his PCP ~~for evaluation~~ for evaluation of allergies and appropriate therapy.

Plan: Discontinue Serzone as he is not taking it. Increase Wellbutrin which he has already increased on his own. He was given the following new prescriptions:

1) Wellbutrin SR 200 mg, one tablet bid, #60, with two refills.

He will be seen again in two months for follow up. His next appointment is on Tuesday, December 10, 2002, at 1:00 p.m. in Chicopee.

Schuyler Whitman, M.D./kmg

SERVICENET MED CLINIC

Steve Boutin 19407 Schuyler Whitman, M.D.
Work type 22.

7/24/02 This patient was seen for 25 minutes.

Data: This is a 46 year old, white male who comes today for medication follow up. Since the patient's last visit on in May he had called complaining that the Effexor made him feel dizzy, weak and tired with a poor appetite and sexual side effects. He wanted to go off of it and did.

Remeron was then recommended but he says that he had thought he had been on it in the past and would wait to see me. He would continue on one Wellbutrin in the morning as he felt significantly better on that and urinary frequency had decreased so that it was tolerable.

Today he says that he really notices when he doesn't take the Wellbutrin. It helps him to feel calm and not get as angry and irritated at things.

He wants to know if there is anything else that could possibly help.

Objective: He is casually dressed and neatly groomed. He is pleasant and cooperative. Mood he describes as better. Affect is moderate range. There is no evidence of psychotic thinking or hallucinations. There is no suicidal ideation. He feels better taking one Wellbutrin in the morning and still has to urinate more frequently then when he is not on Wellbutrin but it is not intolerable.

Of note is that we sent for records from his treatment at Holyoke Hospital but they said they could find none. He will check into that.

Diagnosis:

AXIS I: Depressive disorder NOS with features of anxiety (311).
ADHD.
AXIS II: Diagnosis deferred.
AXIS III: Celiac disease.

Assessment: As he is responding well to Wellbutrin once a day I suggest going up to the 200 mg pills to see if he can get a better response without more side effects. He is agreeable. He also says that he would be willing to try the Remeron because he really does not remember his response to it. I also discussed with him alternatives such as an SSRI all of which have potential side effects and Serzone which does not have sexual side effects but usually has to be titrated up slowly because of other side effects and does have the rare possibility of an idiosyncratic hepatitis, even possibly leading to liver failure.

He is aware of the risks with Serzone and nevertheless would like to try it.

Plan:

1) Increase Wellbutrin SR to 200 mg, one tablet in the morning, #30, with two refills.
2) Serzone 100 mg, one half tab bid x 5 days, then one tablet bid x 1 week, then two tablets bid, #120, with two refills. Signs and symptoms of liver problems such as nausea, vomiting, abdominal pain, malaise were discussed with him and he will contact the clinic if there are any problems and stop the medication.

He will be seen again in two months for follow up. His next appointment is Wednesday, September 25, 2002, at 1:30 p.m.

Schuyler Whitman, M.D./kmg
S223560.000

SERVICENET MED CLINIC

Steve Boutin | 19407 | Schuyler Whitman, M.D. Work type 22.

5/29/02

This patient was seen for 25 minutes.

Data: This is a 45 year old white male who comes today for medication follow up.

He says he tried the Adderall for a week or two but stopped it because it just made him feel too on edge. He is glad he tried it but he doesn't want to continue it. He says that after he went off the Adderall he increased his Wellbutrin back up to 150 mg three times a day. He says he feels okay on that, much calmer, but he is having to use the bathroom ten or fifteen times a day and finds that annoying. He wants to know if there is anything else that might be helpful.

Objective: He is casually dressed and neatly groomed. He is pleasant and cooperative. Mood is "okay." Affect is euthymic. There is no evidence of psychotic thinking or hallucinations. There is no suicidal ideation. He is describing frequent urination on the Wellbutrin.

Diagnosis:

| | |
|---|---|
| AXIS I: | Depressive disorder, NOS with features of anxiety (311). Probable ADHD. |
| AXIS II: | Diagnosis deferred. |
| AXIS III: | Celiac disease. |

Assessment: As he is having a suboptimal response on the Wellbutrin, and is having side effects, we discussed the possibility of trying something else. I brought up Effexor. He is not sure whether he has been on it in the past or not because he recognizes the name from many family members who are on it. He would like to give it a try.

Plan: Decrease and then discontinue Wellbutrin. Discontinue Adderall as he is not taking it. Trial of Effexor.

1) Decrease Wellbutrin SR to 150 mg twice a day for three days, then 150 mg once daily for one week, then discontinue.
2) Effexor XR 75 mg, one tablet daily x 1 week, then two daily x 1 week, then three daily.

He will be seen again in two months for follow up on July 24, 2002, at 1:50.

Schuyler Whitman, M.D./kmg

SERVICENET MED CLINIC

Steve Boutin
5/1/02

Client # 19407
(22)

S. Whitman, MD
Patient was seen for 30 mins.

Data: This is a 45-year old white male who comes for medication follow-up. He was started on Wellbutrin at his first visit in March. He contacted the clinic after about a month and said that he was feeling only about twenty percent better on the medication. It was recommended that he increase the Wellbutrin to 150 mg.t.i.d.

Today he says he feels calmer and he finds that it is much easier for him to speak. He is not tripping over his words and ~~finding~~ struggling to find the word that he needs to say. So that is very pleasant. However, he doesn't notice a marked improvement since going up on the dose and he wants to know about trying the ~~Adoral~~ Adderall. He is not feeling particularly depressed.

Objective: He is casually dressed, neatly groomed. He is pleasant and cooperative. Mood is "okay." Affect is brighter than at the last visit. There is no evidence of psychotic thinking or hallucinations. There is no suicidal ideation. He says he does have some sexual side effects on the increased Wellbutrin, decreased sensation.

Assessment:

AXIS I: Depressive Disorder, NOS, with features of anxiety.
Probable ADHD.
AXIS II: Diagnosis deferred.
AXIS III: Celiac disease.

There hasn't been a great improvement and he is having ~~no~~ some side effects on the increased dose of Wellbutrin. I recommend he go back down to the twice a day dose, particularly if we are going to give him a trial of ~~Adoral~~ Adderall. Risks, benefits and side effects discussed. I advised him to begin with 5 mg in the morning and add 5 mg later in the day if needed (not too late so as to disrupt sleep). He can then go up to two 5 mg pills if needed and tolerated. He is agreeable.

Plan: He was given the following new prescriptions:

1. Wellbutrin SR 150 mg 1 tablet twice a day, #60 with one refill.
2. ~~Adoral~~ Adderall 5 mg 1-2 tablets po q.d. to b.i.d., #120 with no refill.

He will be seen again Wednesday, May 29th at 3 p.m., in Chicopee.

[signature]
Schuyler Whitman, M.D./pmt

**SERVICENET MED CLINIC**

Steve Boutin #19407 (22) Schuyler Whitman, M.D.

3/7/02 The patient was seen for 60 minutes.

Data: This is a 45 year old divorced white male living with his 9 year old daughter. He works in sales at Home Depot where he has worked for 11 years.

He says that he is "tired too much". He has chronic poor sleep even though he sleeps about 7 to 8 hours a night and is not aware of awakening in the night and not being able to get back to sleep he very rarely feels rested. This has been a fairly lifelong problem. He says that he always has two or three or four things going on in his mind. He is vague when he is asked to describe what but denies obsessive worries or anxieties. He says there is always a song as one thing in his mind. He is very distracted and he has memory problems.

Looking back on it he says that he did well in school and was always in the top portion of his class until the 7th grade when he had trouble --. Then he couldn't go on to geometry and from then on he had more and more problems in school. He lost interest and did finish high school but only by going through the motions.

He describes himself as sometimes quick tempered. If he has to work and work hard all he can concentrate on is work. He cannot be sociable at the same time. It is hard for him to get back to things if he is distracted.

He came here because he saw a show on PrimeTime where a woman said that she had taken Adderall and it was like a radio station where three or four things were playing and suddenly the channel was changed and there was just one thing. That is what he would like.

Past Psychiatric History: He saw a doctor in Holyoke ten years ago. He was told his problem was depression and he was treated with Prozac. The dose was increased. That was the most helpful medication for him but he felt like after an initial good response it just didn't seem to do what he wanted it to do and he also got sexual side effects from which he couldn't tolerate. He said he was on a number of others although he does not know which. He recognizes the name Effexor and there is some question of whether he was on Zoloft. He says at one point the doctor was no longer taking his insurance and he didn't bother to follow up with anyone else. He denies a history of psychiatric hospitalizations, any history of suicide attempts or violent behavior.

Past Medical History: He says he has had a medical work up for his complaints of fatigue. He has had thyroid tests and a complete blood count and everything has been normal. He says a while ago he was diagnosed with Celiac Disease. He tried restricting his diet but it certainly didn't help in how he felt day in and day out. He denies a history of heart or liver problems, diabetes, high blood pressure or asthma. He denies a history of head injury, loss of consciousness, or seizures. There are no known drug allergies.

Family History: A son who doesn't live with him has ADHD. He was first diagnosed at age 2 or 3, he is now 11. He has tried Ritalin but did not have a good response. He has also been on Zoloft. Mr. Boutin is not sure what medication he is on now. He thinks his daughter might have ADHD. She has had a lot of problems in school recently and can't remember things. His father had "problems like me". His father was very tense. His only way to relax was by drinking alcohol. He probably drank too much. A brother is on disability. He has a history of depression and some other problems which the patient can't specify. He is on a number of medications.

Alcohol/Drugs: The patient drinks alcohol socially maybe one or two times a week. He says he will have six pack of beer playing pool. He drinks to relax himself. He has never felt he had a problem with the alcohol. He denies drug use. He has tried pot in the past and it put him to sleep.

Social History: He was born in Holyoke, raised in Chicopee. He grew up with his parents. He was the oldest of three children. He had a brother and a sister. Growing up was "not much fun". His father was a truck driver and not very involved with the family day to day life. His mother was a "good stay at home mom" who went to work after his parent's separated when he was 19 years old. They later divorced. There was a lot of fighting in the family growing up. He denies a history of physical or sexual abuse.

He says that he was quite shy as a child. He had some close friends but always felt anxious and uncomfortable socially. He spent too much time by himself. He might have been a little hyper. He is not sure. He was very shy until the 6th or 7th grade and then he started clowning around. He says he doesn't remember a lot of his childhood but he doesn't remember anything positive. From the 7th grade on he had trouble remembering and trouble concentrating.

After high school he worked at a number of jobs such as in a restaurant, doing landscaping, doing construction work "I never had any direction, I didn't like working". He would spend a year here and a year there and either quit or get himself fired. He denies a history of military service. He denies a history of legal problems other than being in probate court for divorce.

He was married 11 years ago and separated 9 years ago. He said after they had their daughter his wife became "out of control" and abusive towards him. He said he hasn't had any other long term relationships that have been monogamous. Right now that is not a particular concern of his.

Mental Status Examination: This is a casually dressed, neatly groomed white male. He is polite and cooperative. His mood is described as a "three on a scale of one to five". He denies mood swings. He does talk about being chronically irritable. He admits to a depressed mood but feels that is secondary to his long standing problems concentrating and being able to relax and socialize with others. There are no overt delusions. He denies paranoid ideation. He says he sometimes feels anxious all day long but denies acute anxiety attacks. He denies suicidal and homicidal ideation. There is no grandiose ideation. He denies auditory and visual hallucinations. He is alert and oriented x3. Immediate recall is three out of three. He remembers two out of three items at five

minutes. Recent memory is grossly intact although a rough screening was done. Remote memory is vague. He fills out ADHD symptom scales regarding childhood between the ages of 5 to 12 and adulthood during the past six months (see attached in chart).

Assessment: This man does not clearly fit the criteria for ADHD however there are some characteristics which are very compatible with the diagnosis. As I discussed with him by definition symptoms should occur before age 7. He dates his symptoms to age 13 and doesn't identify any major stressors around age 13. It is possible that he had symptoms before that but he is not able to recognize or recall them.

His work history does sound very much like someone with a history of ADHD, not sticking with any one particular job for very long. He has stayed at his most recent job for 11 years and says that his life changed after he had kids in that he took things a lot more seriously. Since his oldest child is 11 years old it sounds as if he finally forced himself to stick with one job when he had parental responsibilities.

There is a degree of depression and anxiety which I think needs to be treated. I discussed with him risks and benefits of various medications particularly Adderall which he came in asking for and also Wellbutrin which would be my first choice for treating him. He has some reluctance to start with a stimulant particularly as I told him it could possibly increase anxiety and irritability and because I think besides his problems with concentration and memory there is depression and anxiety. I recommend Wellbutrin and he wants to go with that. Risk, benefits and side effects are discussed.

Diagnostic Impression:

| | |
|---|---|
| AXIS I: | Depressive Disorder, NOS (311) with features of anxiety. R/O ADHD. |
| AXIS II: | Diagnosis deferred. |
| AXIS III: | Celiac Disease. |
| AXIS IV: | Moderate, single parent, children have problems, social isolation. |
| AXIS V: | Current GAF: 58. |

Plan: Trial of Wellbutrin. He was given the following new prescription:

1. Wellbutrin SR 150 mg 1 tablet in the morning for three days, then 1 tablet po bid, #60 with 1 refill.

He will be seen again in four to six weeks for follow up. His next appointment is 5-1 @ 2:30 in Chicopee

Schuyler Whitman, M.D./mcm



Case 3:05-cv-30162-MAP Document 16-9 Filed 09/19/2006 Page 1 of 1

179 Dagget Dr. • W. Springfield, MA 01089
(413) 731-9700

December 23, 2003

Hand Delivery and U.S. Mail

Re: Schedule Change Request

Dear Steve:

We would like to address your scheduling concerns; however, we need to obtain information regarding your restrictions from your doctor. During your employment, you have requested several changes to your schedule. As you are aware, full-time employees are expected to have fully flexible availability, to include evenings and weekends. To date, we have accommodated your requests for a set schedule. Although you are currently working a set schedule from 8:30 a.m. to 5:30 p.m., Monday through Friday, you have requested another schedule change and would now like to work from 7:30 a.m. to 4:30 p.m., Monday through Friday.

We need clarification from your doctor as to why it is medically necessary for you to work this particular schedule from 7:30 a.m. to 4:30 p.m. in order to perform the essential functions of your job as a Phone Center Associate. Enclosed for your doctor's review is a copy of your job description (Phone Center Associate).

In an effort to address the staffing and scheduling needs of the Phone Center, we also need for your doctor to clarify how long your doctor anticipates that you will need to work this particular set schedule and if your doctor anticipates any schedule changes in the future and why.

Thanks for your cooperation.

Sincerely,

Marcia A. Neves

Marcia A. Neves
Human Resources Manager

Enclosure

EXHIBIT
Boutin
Ex. 9 5/17/06
LMO

USA
36 USC 380
Proud Sponsor



ServiceNet

*Integrated Human Services*

March 26, 2004

To Whom It May Concern:

Steve Boutin is a patient here at ServiceNet Medication Clinic and is being treated for depression and anxiety. Steve is currently prescribed medications to help alleviate symptoms. He is also a single parent and responsible for his 10 year old daughter.

It is important for his ongoing mental health that known stressors be reduced as much as possible. One such stressor is when there is a conflict between his work hours and the hours he needs to care for his daughter. Such a stressor can increase his anxiety, impair his ability to cope, and be detrimental to his mental health.

I recommend that Steve's work be scheduled so that he is able to be home during the hours which allow him to best care for and supervise his daughter. This arrangement would alleviate undue stress and support this clients' mental health.

Please call if you have further questions.

Sincerely,

William White, M.D.
Signing for Schuyler Whitman, M.D.
Staff Psychiatrist

WW/lmk

EXHIBIT
Boutin
Ex. 7 5/17/0
LMD

*129 King Street • Northampton, MA 01060 • 413.585.1300 • Fax 413.582.4252 • www.servicenetinc.org • Susan L. Stubbs, C.E.O.*

# ServiceNet

COPY

**BOUTIN, Steve DOB: 05/04/1956 SSN: #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**

**Med Rec: #19407** **Contact**: Pt at 731-9700(w); 552-0103 (h).

**Date**: Monday, December 27, 2004 1:00 P.M. Pt contact: 30 mins. Co-pay: $35 (to be billed).

**Data**: Patient seen solo. This 48 y.o. DW♂ lives with his 12 y.o. daughter & 13 y.o. son with special needs (ADHD, ODD & Autism), as well as his fiancé (marrying in June 2005). Says relationship is going very well. I've only seen him once, 05/24/04, in transfer from Schuyler Whitman, M.D. He was scheduled for September & October, & missed one appointment & then went to the wrong site (Chicopee vice Northampton) for the replacement follow-up. He continues working at Home Depot, & is doing ok there, but isn't always happy with policies. He still feels hopeless there, & his lawsuit with them continues. He's positive about son's response to changes in Rx from Tenex & an antidepressant to single agent Abilify 5 mg, & hopes to taper it further & have d/c trial off it soon. He anticipates continuing to have him with him since says wife recently caught smoking marijuana, etc.

**Rx Issues**: I found a loose script in the chart from Dr. Kraft in my absence for Valium® (diazepam) 5 mg x 1-2 tabs P.O. HS PRN insomnia #60 NR dated 12/01/04 in chart, but was unclear if it'd been called in or not; we'll forward it as cover to Stop & Shop, W. Springfield if was called in there. Past Rx trials included ADHD Rx that didn't go well (including Ritalin, ADDerall & Strattera), antidepressants Serzone, Effexor, & Prozac, but noted last visit that Wellbutrin had worked the best. He says Wellbutrin-XL helped with tension, impatience & anger. Sleep better with Valium, & averages 2 x 5 mg a night.

**Vegetative Signs**: Sleep: "Not bad" with about 7-8 hours of sleep. Intact with Valium. Appetite: Good with stable weight currently at 160 pounds on his 5' 10" frame. Says his weight never seems to change. Energy: Intact, good, though a little low at work since he watches the clock there more. Says he's better now that the three ♀ "who made his life hell there" have left.

**Therapy**: None since he originally came to ServiceNet. He says since it's required, he will do it, & agrees to call, but doesn't feel he needs it. Given Cathy's direct line at 585-1328. He'd like to see someone here at Chicopee.

**Substance Abuse**: Drug: Denies. Alcohol: In May 2004 reported to me drinking a case of beer a week. Today he says he looks forward to his reward at the end of the day of a couple of beers, but also does it on weekends. Tobacco: Says tobacco free since 2000. Caffeine: Two cups of coffee QAM.

**Medical**: PCP: Riverbend Medical; whichever provider is available. No recent visits. Medical Concerns: None; says did go once for cerumen buildup. Med Rx: None.

**Pharmacy**: primary: (w) Stop & Shop, West Springfield. Occas: (h) Stop & Shop, Memorial Drive, Chicopee.

**MSE**: Presentation: Intact grooming, good eye contact, pleasant except when talking about work. Speech: Talkative, spontaneous, upbeat in tone except re work. Mood/Affect: Says only feels depressed & anxious about work. He reports he has imagined images of paper cuts & the like when he's at work, which seems strange to him, but also captures his feelings about work. Cognition: Appears intact, at baseline. S/I & H/I: Denies both. Psychosis: Denies per se except for the odd cutting thoughts above. Movement: Normal range, adequate animation.

**DSM-IV-TR Diagnosis**:

I. Depressive Disorder, NOS (311)
Anxiety Disorder, NOS (300.00)
R/O ADHD (past diagnosis; now questioned).
R/O Alcohol Dependence (303.90) vs. Alcohol Abuse (305.00)

II. R/O Personality Disorder, NOS (301.9)

III. Medical: Environmental Allergies.

**Impression/Plan**: Pt appears to be fairly stable on current Rx, has some positive things going on in his life (son's change of Rx & improved behavior & outlook, & upcoming marriage) while he continues to struggle with situation at work. No need to change Rx seen at this point, while use of Valium is appropriate & not compounded by alcohol used. He'll talk to his PCP about prescribing for him, & took a release of information with him to complete so we can communicate with PCP & vice versa. He agreed to try therapy, but if not a match, wants to go PCP route.

**Rx**: Valium® (diazepam) 5 mg x 1-2 tabs P.O. HS PRN insomnia; MDD 10 mg; (12/27/04 #60 R5).
Wellbutrin® (bupropion) XL 300 mg P.O. QAM; (12/27/04 #30 R5).

**Follow-up**: Monday, April 18, 2005 at 1:00 P.M.

[signature]

William B. White, M.D., Staff Psychiatrist

**SERVICENET MED CLINIC**

**Boutin, Steve** Client # 19407 (22) William B. White, M.D.

10/01/2004 DOB: 05/04/1956 Minutes spent: seen: 0 Collateral: 0 .

Patient came to Chicopee at appointed time today; had been rescheduled from 9/20/04; rest of day full, so will have to reschedule in near future. Likely has Rx to about 10/21/04.

William B. White, M.D.
Staff Psychiatrist

2

**SERVICENET MED CLINIC**
#19407 (22)

Steve Boutin
10/1/04

William B. White, M.D.

The patient went to the Chicopee office today for the 1:15 appointment rather than Northampton. We will try to reschedule him but I am unaware of when that will be at this time.

William B. White, M.D./mcm

**SERVICENET MED CLINIC**

BOUTIN, Steve 19407 W. White, M.D.
9/20/04 (22)

Data: The patient was presumably a no-show for a 1:00 p.m. appointment today, though the clinic doesn't open until 1:00 p.m. and he may have come and left early. I have seen him once on 5/24/04 in transfer from Dr Whitman and he reported that he was stable on his Valium and Wellbutrin. At that time he was given four refills, so should have adequate medication to last until around 10/21/04.

Plan: We will await a call back from the patient for a new appointment, though it is noted that he doesn't have a therapist and might be best referred to a private provider who takes Cigna and who wouldn't have the therapy requirement of this clinic.

William White, M.D./mlj

**SERVICENET MED CLINIC**

Steve Boutin #19407 (22) William B. White, M.D.
5/24/04 The patient was seen for 30 minutes.

Data: This is a 48 year old divorced white male living with his 12 year old daughter and 13 year old son with special needs. He says the son has a history of violence which the mother couldn't handle anymore so the son just recently moved in with the father. He currently has a law suit going on at work due to what he says is discrimination. He says he has had difficulty getting a schedule to match his needs to take care of his son as a single parent. He is asking now for a set schedule and Dr. Whitman had written a letter dated 5/17/04 which was dictated a week ago and which hopefully will meet his needs. He was hoping that the letter would explicitly say that he couldn't work on weekends but I said it did so by implications and requested a work schedule Monday through Friday for the foreseeable future.

He says that he has had some harassment at work and that they caught him on camera on 5/7/04 scratching some lottery tickets at work. He says that they are being very petty about these sorts of things and in fact a co worker had given him a birthday card with a couple of lottery tickets in it since his birthday was 5/4, and he had just turned 48. He is requesting to go to a different site for Home Depot due to those sorts of issues.

Psychiatric History: The patient says that he has never been formally psychiatrically hospitalized but at age 22 he says that he shot some guys with a 12 gauge shotgun but didn't do any real harm but as a result was sent to Northampton State Hospital for three weeks for evaluation and eventually released. He says that he has never actually attempted suicide. He has been on tried on a number of different medications including antidepressants Serzone and Effexor and Prozac but feels that he has done best with his current Wellbutrin. He has also been on trials of ADHD medication including Ritalin, Adderall and Strattera though the later was only for one day and the others caused some problems and he is not interested in pursuing that.

Psychiatric Review of Systems: The patient says that he has never really been depressed or manic in the past and says that his anxiety is generally stronger than his depression. However he went on to say that when he was preparing for Probate Court as he has done a number of times on his own that he actually did get quite active and high energy and didn't need much sleep until the court was over.

In terms of anxiety he says that he used to be shy but is less so as time goes on and less so due to improved focus with Wellbutrin. He says the feels more relaxed and as a result has been more outgoing. He denies any specific phobias. He denies any notable OCD symptoms and says that generally he is fairly organized though tends to be forgetful. However he says he doesn't lose things because of his organization. He denies any PTSD symptoms.

In terms of psychosis he denies any history of auditory or visual hallucinations or paranoia, etc. He notes that his son has diagnoses of ADHD, ODD and Autism.

In terms of substance abuse he says that he has always been a social drinker and has a couple beers a day during the week and a few more on the weekend. However when I asked him how long a case lasted he said a 24 can case lasts about a week, implying more use than expected. Previous note noted that he had used marijuana in the past briefly but didn't like it since it just put him to sleep.

In terms of other symptoms he does note that he has somewhat intrusive thoughts of pain at work but only there. He says he will have a thought about what a paper cut to his eye would feel like or what some other mild assault to his body would feel like and then feel some distress but doesn't know why he is having these symptoms.

Medication Issues: He says that the Wellbutrin has really helped and he feels that the XL version works better than the XR and the urinary frequency has also lessened. He recollects in the past that he would be very tense, couldn't relax, felt impatient and angry, and had periods of losing control, which he says runs in the family and he saw this in his father. However now with Wellbutrin these things are much improved. He also says the Valium helps with sleep and nighttime relaxation.

Vegetative Signs: He reports that sleep has been good with Valium but otherwise he wakes up tired in the morning. He says that he remembers his dreams and they are much more colorful with Valium. He says his appetite is good and consistent and his weight is stable. He says his energy is okay.

Therapy: The patient says he doesn't believe he has any issues that warrant therapy at this time though certainly a case could be made for exploring the underpinnings of his thought process around anger, impatience, etc. Since he has come to ServiceNet he has not had therapy nor does he plan to do so.

Substance Abuse: As above the patient denies any drug use but does drink a case of beer a week by his report. He says he has been tobacco free for about four years. Caffeine use is limited to two cups of coffee in the morning.

Medical: The patient sees the primary care provider of the day at Riverbend Medical whenever he needs attention. He says he is on no medications from them.

Pharmacy: He uses Stop & Shop in West Springfield because it is near work or sometimes Stop & Shop on Memorial Drive in Chicopee since it is close to home.

Mental Status Exam: This is a 5'10", 160 pound white male who presented in comfortable clothing for the weather, namely shorts and a shirt. Eye contact was good. Speech was spontaneous. He didn't seem notably depressed or anxious but did have a bit of an irritable edge as he talked about the difficulties at work though was not unpleasant toward me. He denies any hallucinations or paranoia and I saw no overt evidence of psychosis. He denies any suicidal or homicidal ideation. Cognitively he was oriented x3 including the exact date and was able to focus well enough to spell

the word "world" forwards and backwards. Psychomotorically he was in normal range and adequately animated.

Diagnosis:

AXIS I: Depressive Disorder NOS (311).
Anxiety Disorder NOS (300.00).
Past Diagnosis of ADHD which may be questionable.

AXIS II: R/O Personality Disorder NOS (301.9); historically no diagnosis per Dr. Whitman's evaluation.

AXIS III: Environmental allergies.

Assessment/Plan: As the patient reports that he is doing well on his current medications we will continue these and fresh scripts were written as follows:

1. Valium (Diazepam) 5 mg #60 1 to 2 tabs po hs PRN insomnia/anxiety R4 (says lately he has been taking 1 but sometimes takes 2).
2. Wellbutrin XL (Bupropion) 300 mg #30 1 tab po q a.m. R4.

Follow up scheduled for 9/20/04 at 1:00 p.m.

William B. White, M.D./mcm